GEORGE NELSON, Administrator,

*vs.*

BURNHAM & MORRILL COMPANY.

Cumberland. Opinion December 14, 1915.

*Dangerous and Attractive to Children.     Elevator.     Instantaneous Death.
Invitee.     Licensee.     Negligence.     Trespasser.*

A boy thirteen years of age had been accustomed to visit a canning factory for his own pleasure. He had, by the permission or sufferance of employees, learned to run the elevator. One day he was directed by the superintendent to leave the building. Instead of doing so, he remained and amused himself by riding up and down the elevator. While operating it, he was killed in some way not explained. In a suit by his administrator to recover damages, it is held.

1. The deceased was a trespasser.
2. The defendant owed him no duty except not wantonly to injure him, and the fact that he was a child of tender years does not change the rule.
3. The doctrine that an owner of property is liable for injuries to children when caused by structures and appliances attractive to them does not hold in this State.

On exceptions by plaintiff. Exceptions overruled.

This is an action on the case brought by George Nelson, administrator, to recover damages for the death of Albert Nelson, a boy thirteen years of age, which occurred in the defendant's factory on account of the alleged negligence of the defendant. At the conclusion of the plaintiff's evidence, the presiding Justice directed a nonsuit. The plaintiff excepted to said nonsuit. Plea, the general issue.

The case is stated in the opinion.

*Ralph O. Brewster,* for plaintiff.

*Carroll L. Beedy,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, KING, HALEY, HANSON, JJ.

SAVAGE, C J. Action for damages resulting from the death of the plaintiff's intestate, Albert Nelson, through the alleged negligence of the defendant. The death was instantaneous, and the action is brought under Revised Statutes, Chapter 89, Section 9. The case comes up on the plaintiff's exceptions to an order of nonsuit.

The plaintiff's intestate, a boy thirteen years of age, was killed in some way in or about the elevator in the defendant's canning factory. He was not employed by the defendant, but for several months, in company with a playmate named Alexander, he had frequently visited the defendant's factory. They seem to have been attracted there, at first at least, by the fact that Alexander's brother, Billy, then between fourteen and fifteen years of age, was the elevator boy in the factory. Nelson and Alexander had no business in the factory. They went there merely for their own pleasure. Sometimes when there, they assisted Billy in his work, other than running the elevator. And a few times they assisted one or others of the employees. Once or twice they were rewarded by the employee whom they assisted by the payment of five or ten cents. Two or three times they had been told by overseers or bosses to leave. But notwithstanding this they continued to visit the factory, without any further objection on the part of any one until the day of the accident. When they first went there the man in charge of the basement room sent them away, but learning from the elevator boy that Alexander was his brother, he said "That is all right." Billy taught them how to run the elevator, and they frequently took rides upon it, up and

down, for their own pleasure, operating it themselves. The elevator could be started up or down by pulling one or the other of two cables, and these cables could be reached from the elevator opening on any floor. There was a device for locking the elevator cage, so that it could not be moved up or down except by one having access to the cage itself. But ordinarily it was left unlocked, except when loads were being put onto it, or taken from it. When not in use, the entrance to the cage was usually open, although there were doors in the frame work of the well which could be closed. There was also a bell system by which the elevator could be signalled from floor to floor. The elevator was designed and used only for the carriage of freight, and not for passengers.

On the day of the accident at about two o'clock in the afternoon, young Nelson was started by his mother for school. But instead of going to school he went to Alexander's home and they together went to the defendant's factory. While there they went to the second or third floor where Billy was at work. At that time McManus, the "head boss," so called, came and told Billy that he had orders from the superintendent "to tell those boys to keep out," and added "Why don't they go down to the fish house with Dixie, where it is warm," the fish house being in a separate building. This message was communicated by Billy to Nelson and Alexander. And Nelson asked Billy if he had better go, and was answered, "Yes, you will have to go right out." Instead of going out, however, or of going down to the fish house, they remained with Billy, and helped him to finish loading a truck which was to be taken to an upper story by the elevator. Billy wheeled the truck onto the elevator and went up with it, leaving Nelson and Alexander in the room. Billy wheeled his load off the elevator, and went to work chopping meat. He had nothing more to do with the elevator until after the accident, which occurred, as nearly as can be gathered from the testimony, between one and two hours later.

In the meantime, Nelson and Alexander pulled the elevator down from where Billy had left it, and rode up and down on it several times. Finally Alexander went down on it alone, leaving Nelson on the second floor. Alexander called up to Nelson and asked him if he was coming home. He answered that he "was going up to wait for Billy." Being asked, "What happened next?" Alexander testified,

"When I looked up I seen his feet hanging." "And when I got up he fell in the well." In fact he had been killed. This is all the account we have of the catastrophe. No eye saw him. No one knows how it happened. No one knows in what manner or from what particular cause he went to his death. An opportunity for it was, of course, afforded by the open, unguarded entrance to the well.

We will mention only one other feature in the history of the case. It seems that earlier in the same day, as a witness for the plaintiff testified, a notice, "Danger, ring bell," had been stencilled on or about the elevator. Nelson saw it and asked Billy what it meant, and was told, "You are supposed to ring the bell before you pull any wire."

The plaintiff's declaration contains two counts. In the first he alleges that his intestate was in and about the defendant's factory by its license or permission, that the defendant's negligence consisted in the failure to guard the elevator properly with regard to the presence of a child of the tender age and understanding of the intestate and that the latter in the exercise of due care was caught between the elevator and the adjoining wall as the elevator was ascending. In a second count the plaintiff charges that the elevator was dangerous, and was attractive to children, that the defendant knew that young children were attracted to the factory by it, that it was the defendant's duty to use reasonable precautions to prevent his intestate, a child of tender years, from coming to bodily harm by reason of the enticement and allurement of the elevator, and that it failed to do so.

We must first inquire what were the duties, if any, of the defendant to young Nelson? And the answer to this question depends upon whether Nelson was at the time of the accident an invitee, a licensee, or a trespasser. If he was an invitee, the defendant owed him the duty of using reasonable care for his safety. If he was a mere licensee or if he was a trespasser, the defendant owed him no duty, except not wantonly to injure him, nor to set traps for him. *Russell* v. *M. C. R. R. Co.,* 100 Maine, 418; *Stanwood* v. *Clancy,* 106 Maine, 72; *Austin* v. *Baker,* 112 Maine 267. It is clear that Nelson was not an invitee, either express or implied. He had no business in the factory. He had nothing to do with its business. He went there solely for his own pleasure. *Stanwood* v. *Clancy,*

supra. It may be that a jury would be warranted in finding that up to the time of the notice from McManus to leave he was a licensee. He was permitted to come and remain in the factory under such circumstances as perhaps would warrant the finding of an implied license. We may assume it to be so. But after the notice from McManus, an hour or two before his death, he can be called nothing but a trespasser. The implied license, if any, was revoked, and the knowledge of the revocation was brought home to him. He was no longer permitted to be anywhere in that building. He was no longer licensed to be in or about the elevator, or to operate it. He could no longer rightfully remain in the rooms through which the elevator passed. In accordance with well established principles, the defendant did not owe him the duty of protection unless children trespassers stand on a different footing from adults.

. The plaintiff in argument lays much stress upon the fact that the elevator boy was under the age of fifteen years, and that his employment under that age was forbidden by statute, Laws of 1907, Chapter 4; and upon the fact as claimed that Nelson was permitted, though under the age of fifteen years, to operate the elevator, which is also forbidden. See same statute. Violation of a statute may be evidence of negligence on the part of the violator. But it is only evidence. If this were material, it would be sufficient to say in this case that the elevator boy, or the operation of the elevator by him, had nothing to do with this accident. He had left the elevator an hour or two before and was engaged on other work. And as to permitting Nelson to operate it, the permission, if any, ceased when McManus gave the notice. When Nelson was killed he was operating it without permission, even if that kind of operation comes within the meaning of the statute. But the real and conclusive answer to the proposition is that the defendant owed no duty to Nelson at the time, because he was a trespasser. And if it owed him no duty, it was not negligent as to him.

But the plaintiff earnestly contends that even if his intestate was a trespasser, the defendant was liable for failure to use reasonable precautions to prevent injury to him, inasmuch as he was but a mere boy. In short, the contention is that the rule as to trespassers, which we have stated, ought to be and is relaxed when the trespasser is a child, and that as to trespassing children the owner of the premises

in such a case as this is bound to use care to protect them from injury. It is true that such a relaxation of the rule has been applied by some courts. But such is not the law in this State. *Elie* v. *Street Railway,* 112 Maine, 178. In the case cited, this court held that "in the absence of wanton or recklessly careless conduct on the part of the defendant, the plaintiff, although a child of tender years, if a trespasser, occupies no better position and has no greater rights than an adult." As was said in *Nolan* v. *N. Y., N. H. R. R.,* 53 Conn., 461, "an owner is under no duty to a mere trespasser to keep his premises safe, and the fact that the trespasser is an infant cannot have the effect to raise a duty where none otherwise exists." *Bottum* v *Hawkes,* 84 Vt., 370; *McGuiness* v. *Butler,* 159 Mass., 233; *Buck* v. *Amory Mfg. Co.,* 69 N. H., 257; *Indianapolis* v. *Emmelman,* 108 Ind., 530. In 2 Thompson on Negligence, 1183, the author says. "In dealing with cases which involve injuries to children courts have sometimes strangely confounded legal obligations with sentiments that are independent of law." With purely moral or sentimental obligations, the law does not deal. *Buck* v. *Amory Mfg. Co.,* supra.

In his second count the plaintiff seeks to bring the case within the doctrine sustained by some courts in the so called "turn table" cases, wherein owners have been held liable for failure to guard structures and appliances attractive to children who were injured thereby, although the children were trespassers. Such structures have been called "attractive nuisances." An interesting and exhaustive note on the subject of attractive nuisances may be found in 19 L. R. A. (N. S.) 1094, where the cases are collected.

Our court said in *McMinn* v. *Telephone Co.,* 113 Maine, 519, that "the doctrine of 'attractive nuisances' has never been adopted in this State." And upon what seems to us to be the better reasoning, we think it should not be. This rule is certainly an innovation upon the rules of the common law. It has never been thought until recent years that an owner, under any conditions, was bound to protect trespassers, and no distinction was made between adults and children. The rule changes what may be regarded perhaps as a sentimental duty into a legal duty. It infringes upon the salutary and necessary rule that an owner may do what he will with his own so far as he does not interfere with the legal rights of others. It is an unjustifiable restraint upon the right of an owner to conduct his business

as he sees fit.  It is a burden upon his business, and a burden created in favor of one who is at the same time trespassing upon his rights.

In the case of *Railroad* v. *Stout,* 17 Wall., 657, which was practically one of the first to declare this rule, and which is the leading case in support of the rule, the court said that the jury in that case were warranted in finding that children would probably resort to the turn table there in question, that there was a probability that an accident would occur to a child, and that it could have been prevented without considerable expense or inconvenience; and upon these premises, the court assumed a legal liability without discussion of reasons, and upheld a verdict for the plaintiff.  And this conclusion has been followed, and in some cases enlarged upon, by other courts.    But what logical reason is there for saying that one, young or old, who is wrongfully upon premises, can hold the owner to the expenditure of *any* money, or to submission to *any degree* of inconvenience, for his protection?   We can think of none.   We think there is no reason except the sentimental one, and that is not the basis of a legal obligation.  *Daniels* v. *Railroad Company,* 154 Mass., 349; *Holbrook* v. *Aldrich,* 168 Mass., 15; *Bottum* v. *Hawkes,* supra; *Frost* v. *Railroad Co.,* 64 N. H., 220; *Deleware, L. & W. R. R. Co.* v. *Reick,* 61 N. J. L., 635; *Walsh* v. *Fitchburg R. Co.,* 145 N. Y., 301; *Railroad Co.* v. *Harvey,* 77 Ohio St., 235; *Ryan* v. *Tower,* 128 Mich., 463; *Wilmot* v. *McFadden,* 79 Conn., 367; *Pannill* v. *Railroad Co.,* 105 Va., 226; *Uttermoklen* v. *Boggs Run Co.,* 50 W. Va., 457.

We must hold, therefore, that the case discloses no liability on the part of the defendant, and that the order of nonsuit was right.

*Exceptions overruled.*