ELVIRA RAMOS, Plaintiff and Appellant, *v.* SUCESIÓN J. SERRALLÉS, Defendant and Appellee.

No. 6946. Argued February 11, 1937.—Decided April 22, 1937.
Rehearing denied June 15, 1937.

*Cayetano Coll Cuchí* and *Víctor A. Coll* for appellant. *Fernando B. Fornaris* for appellee.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the court.

Elvira Ramos seeks to recover damages for the death of her daughter, a child 3½ years old, alleged to have been caused by the negligence of the defendant. The lower court rendered judgment for the defendant, and thereupon the plaintiff took the present appeal.

The defendant company is engaged, among other businesses, in the planting of cane and the production of sugar. There is a settlement in one of the defendant's plantations, called ''Colonia Segunda Cintrona,'' where employees and laborers of the defendant who work in said plantation live. This settlement consists chiefly of an alleyway or small square along which there are two rows of buildings, including a store, quarters for laborers, the overseer's house, and several dwelling houses. The plaintiff lived in one of these houses at the time the events giving rise to this litigation occurred. Children of various ages live in the neighborhood and they usually play in the said way or square.

Every year, during the grinding season, the defendant lays a portable railroad track that runs from the sugar-cane plantation abutting on the settlement, along the alleyway or square that separates the said establishments, and finally connects with the main track of defendant's railroad. The defendant uses said portable track for the transportation of sugar cane from the said plantation, in railroad cars drawn by oxen. Then the cars are hitched to a steam engine which hauls them to the factory.

During the 1933 grinding season, the defendant laid this track along the alleyway. On June 9, 1933, they were hauling sugar cane in five railroad cars drawn by three yoke of oxen that were being driven by laborers. At about 3:30 o'clock in the afternoon of the same day, the drivers were forced to stop the cars because a buggy was standing across the tracks. The last of the cars stopped more or less directly in front of the house of the plaintiff. One of the laborers

in charge of tending the cattle took advantage of this opportunity to feed the oxen with the aid of the drivers. After his work was completed, the said laborer signaled the drivers to proceed. No sooner had the cars started moving than they were stopped again upon hearing the screams of a woman who yelled from the balcony of her house that one of the cars had run over a child. When the man in charge of the cattle looked back and saw Juanita Ramos, the eldest daughter of the plaintiff, rolling on the track, he rushed to her aid. The girl died that same afternoon in consequence of the injuries received.

The appellant complains that the doctrines of attractive nuisance and *res ipsa loquitur* were not applied to this case.

The courts which have adopted the first one of said doctrines have held that where a person maintains in his own, or in somebody else's property, or at a public place a dangerous instrumentality capable of attracting children of tender years, that person should take all due precautions commensurate with ordinary prudence to save harmless the children that come or may come to the place of danger.

This court, in the case of *Rivera* v. *Porto Rico Drug Co.,* 32 P.R.R. 470, set forth the reasoning adopted by some respectable authorities, reproducing therein their views concerning this most important question, and applied said doctrine in this jurisdiction. Moreover, that doctrine has been ratified in subsequent cases. *González* v. *P. R. Ry., Lt. & P. Co.,* 34 P.R.R. 545; *Alvarez* v. *Santa Isabel Sugar Co.,* 37 P.R.R. 100; *Acosta* v. *P. R. Ry. Lt. & P. Co.,* 37 P.R.R. 388; *Berríos* v. *Garáu,* 46 P.R.R. 773.

There are numerous decisions on this much-debated question and they have given rise to many and varied commentaries. Even in those jurisdictions where the doctrine has been accepted, the courts are not entirely in accord as to the conditions under which it should be applied.

Mr. Justice Clark, in his dissenting opinion in the case *United Zinc & Chemical Co.* v. *Van Britt,* 285 U.S. 268, 36

A.L.R. 32, says that the American courts have been divided with respect to the principles of law applicable in the cases of attractive nuisance. "At the head of one group," he says, "from 1873 until the decision of to-day, has stood the Supreme Court of the United States, applying what has been designated as the 'humane' doctrine. Quite distinctly the courts of Massachusetts have stood at the head of the other group, applying what has been designated as a 'hard doctrine,'—the 'Draconian doctrine.'"

It is a well-known fact that the Supreme Court of the United States adopted this doctrine for the first time in the case of *Sioux City, etc., R. Co.* v. *Stout,* 17 Wall. 657, 21 L. ed. 745, decided in 1873. Its origin dates back to the year 1841, when the case of *Lynch* v. *Nurdin,* 1 Q. B. 28, 113 Eng. Reprint 1041, was decided. Since the said doctrine found its way into the American jurisprudence, it has been the object of criticism and praise which have sought to bring forth its soundness and its weakness. It can not be disputed that the doctrine has survived the severe criticism to which it has been subjected in a number of jurisdictions, that it has demonstrated its vitality by the mere fact of its survival, and that it is inspired not only in a sense of humanity, but also in principles of justice of undeniable fairness.

In the case of *Lucas* v. *Hammond,* 150 Miss. 369, decided in 1928, it is stated that the doctrine has been repudiated by a majority of the courts, and that it requires a careful exposition in order not to turn it into an impracticable and unfair requisite. We are not of that opinion. It is true that the aforesaid doctrine has been repudiated by important courts such as those of Massachusetts, New Jersey, New York, and Pennsylvania, although the courts of the last two States have not entirely gotten away from being influenced by the principles set forth in the cases where the attractive nuisance is located in a public way or in any place where a child has a right to be; but it is also true that many important courts have followed the doctrine under discussion, and that they

are more numerous than the others. What really can be said is that there the tendency is to limit it rather than to extend it.

The main argument against the adoption of this doctrine by the courts which repudiate it is that it detracts from the full ownership of property.

"This rule," says the Supreme Court of Maine in *Nelson* v. *Burnham & Morrill Co.*, 114 Me. 213, 95 A. 1029, "is certainly an innovation upon the rules of the common law. It has never been thought until recent years that an owner, under any conditions, was bound to protect trespassers, and no distinction was made between adults and children. The rule changes what may be regarded perhaps as a sentimental duty into a legal duty. It infringes upon the salutary and necessary rule that an owner may do what he will with his own so far as he does not interfere with the legal rights of others. It is an unjustifiable restraint upon the right of an owner to conduct his business as he sees fit. It is a burden upon his business, and a burden created in favor of one who is at the same time trespassing upon his rights."

The courts which refuse to apply this doctrine defend their attitude relying on the stronghold of individual property and the right of the owner to freely enjoy it.

In an article published by Jeremiah Smith in 11 Harvard Law Review 349, both viewpoints are analyzed, the one that deals with the use of property and with the damage that said user may occasion under certain circumstances. Even though Judge Smith expresses himself quite impartially, his arguments appear to favor the tendency of the courts which rely on the traditional theory of title in order to refuse to accept the principles based, according to the Supreme Court of Maine, on what may be considered as a sentimental duty. This duty, according to said court, infringes on the principle that the owner may do as he pleases in his property so long as he does not interfere with the legal rights of others. And, what is understood by legal rights? Precisely that is the

dividing wall that stands in front of the courts that refuse to accept the aforesaid doctrine. A child, no matter how young, who enters upon the land of another is a mere trespasser, and for that reason the owner of the property who creates therein a dangerous condition does not incur in any liability for the damages that he may occasion to the child by virtue of the attraction, inasmuch as the child, being a trespasser, it can not be said, in the opinion of those courts, that his legal rights have been interfered with. The law tends to establish rules for the preservation of life and the protection of human beings from great bodily injury, and it does not seem that this purpose is accomplished where an owner is allowed to use his property without adopting all due precautions, where he knows that such user may result in great bodily injury to the young children who enter his close. The doctrine is based on a sense of humanity, but on that account its principles do not fail for justice. Both things are entirely compatible, and this compatibility is required in certain instances as a safeguard to life and to avoid great bodily injury.

The eminent text writer Francis H. Bohlen, a former professor at Harvard University and now teaching at Pennsylvania University, in an article just published in 50 Harvard Law Review 737, says:

"However, the greatest inroad into the traditional immunity of a possessor of land is the so-called 'attractive nuisance' doctrine, which, like many new doctrines, has, in the states adopting it, been extravagantly extended and arbitrarily restricted. Out of the confusion of the innumerable cases there have emerged certain definite guide posts, a more or less definite approach to the solution of the individual case. Two things are required as essential to liability: first, a condition maintained on the premises which is clearly recognizable as dangerous to those who meddle with them in ignorance of the dangerous character of the condition; second, the likelihood that children, as such incapable of realizing the danger, will trespass upon the land and be tempted to tamper with them. As against these

factors, which determine the magnitude of the risk, is offset the necessity of allowing landowners to put their land to such uses as they may desire and, therefore, account must be taken of the interference with its reasonable use which would be entailed by the precautions necessary to make the conditions safe. It is inevitable that in the application of this method the results will vary in different jurisdictions in accordance with the relative value which in the particular place is ascribed to the two conflicting interests, that in securing the safety of infant citizens and the interest in allowing the utmost freedom to the proprietor. Even in those jurisdictions in which the 'attractive nuisance' doctrine is in terms repudiated, there are cases which apply its basic principles where the danger is extreme and the burden of preventing it is slight, or where the danger is maintained in close propinquity to a highway or other public place. All of these instances in which a landowner has been held liable to a trespasser, adult or infant, are a wide departure from the dominional sovereignty which was traditionally ascribed to the ownership of land. If the owner be sovereign in his own domain, it is impertinent for the King's law to meddle with what goes on therein (an idea cognate to that which still dominates the law which relates to injuries given and received within the family circle), and so far as the King's courts are concerned the landowner may do what he pleases unless he has brought his land within their jurisdiction by permitting the entry of persons not members of his household group. It is unfortunate that this ancient idea of the peculiar sanctity of proprietorial dominion should have taken such deep root in many parts of the United States. It is even more unfortunate that the devotion of a very great judge to it has caused the Supreme Court of the United States to adopt a limitation upon the 'attractive nuisance' doctrine which has no relation to the only reasons upon which that doctrine can be supported. In *United Zinc & Chemical Co.* v. *Britt*, the Supreme Court of the United States in an opinion by Mr. Justice Holmes whose judgment in matters of general public importance is so excellent, denied recovery because the plaintiff had not known of the poisonous pool in which he bathed until after he had come upon the defendant's land as a trespasser. Thus, the 'attractive nuisance' doctrine was restricted to cases in which the landowners could be regarded as having brought the plaintiff upon his land by some act which could by a tour of force be brought within the category of invitation, consent or temptation.''

In the opinion criticized by the commentator, Justice Holmes asserts that the duty of one who invites another upon his land not to lead him into a trap is well-settled, and while it is plain that temptation is not invitation, it may be held that knowingly to establish and expose, unfenced, to children of an age when they follow a bait as mechanically as a fish, something that is certain to attract them, has the legal effect of an invitation to them although not to an adult. It should be stated that Mr. Justice Taft, Mr. Justice Day, and Mr. Justice Clarke dissented, the latter justice writing the dissenting opinion.

As may be seen, Mr. Justice Holmes took as a basis for his conclusions the settled principle of an invitation to a child who, being out of the danger zone, is attracted by the danger. When the child enters into the land of the owner without noticing the existing conditions, liability does not arise on the latter's part. Starting from that point, it is not strange, although it may seem unfair, that the theory is upheld that the owner owes no duty to the child who was attracted by the danger after he entered the close, inasmuch as such a state of affairs can not be considered as a technical invitation to come upon the premises.

On the same subject the following comment is made in a footnote appearing in 36 A.L.R. 137:

"Properly the reason for the child's presence is material only as bearing on the question whether his presence was reasonably to have been anticipated.

"It must, however, be admitted that some courts have regarded it as essential to liability that the child's presence should have been due to the attraction. This view is a logical consequence of the implied-invitation doctrine, since a child whose presence is not attributable to the attraction cannot be held to have accepted the implied invitation extended by the attraction. The view may also be accounted for upon the theory that the duty owed by the landowner is only to children who are lured by the attraction, so that no duty is owed to those whose presence is not attributable to the attraction. But this seems to be too restricted a conception of the landowner's

duty, and is inconsistent with the view [which was given effect in *Atlanta & W. P. R. Co.* v. *Green* (1917) 158 C. C. A. 632, 246 Fed. 676 (5th C.)] that a person injured going to the rescue of a child who has been lured by the attraction into a place of danger may recover damages.

"On principle, therefore, it would seem that if there was reason to anticipate the presence of children, it would make no difference how the child who was injured happened to come upon the premises."

This is, in our opinion, the better doctrine. The other one rests on the fallacy of an invitation that does not exist and that logically can not exist in fact. The natural thing is that the owner of the land does not desire to have any children enter upon his property, and it can not be said that there is an implied consent arising from the existence of the attraction. The owner can, as it is frequently done, put up signs in his property stating that trespasses into it are prohibited. Can it be said that there has been an invitation because of the mere fact that the person who entered upon the premises was a child attracted by the dangerous condition? Certainly not. This fallacy has given rise to deviations and perplexities which have rendered the application of the so-called attractive-nuisance doctrine still more complicated, and have given rise to theories which are, in every sense, deplorable because due to their departure from reality they do not cover all the cases that should come under the protective mantle of the law.

To require that the child, in order that liability may arise, must have been attracted into the property by an act that through a *tour de force* may fall within the category of an invitation, consent, or temptation, is not a good doctrine, as stated by Professor Bohlen and as sustained by the author of a footnote appearing in 36 A.L.R. 292.

Under the common law, the owner or occupant of the property owes a trespasser but the duty not to cause him willful or wanton injury. The basis for that rule is that the owner has a right to rest on the assumption that other persons will obey the law and will not trespass upon his property.

In order to render this rule inapplicable to children of tender years, the theory has been advanced that they are not technically trespassers, but should be considered as invitees. According to the author of said note, an examination of the duties owed to trespassers will show that it is unnecessary to make an exception of children of a tender age. "Under what circumstances," he asks himself, "is the owner or occupier of private property liable to an adult trespasser?"

On the one hand we have that the owner is liable for injuries occasioned to a trespasser by means of spring guns or mantraps.

In the case of *United Zinc & Chemical Co.* v. *Britt, supra,* it is stated that this liability does not arise from the fact that the owner has rested on the assumption that the people will obey the law and not trespass upon the property, but on the contrary, from the fact that he has expected the trespasser and prepared an instrumentality to cause him damage. So that in this case the assumption is discarded and the owner rendered liable for having wantonly and wilfully prepared an instrumentality to injure the trespassers. There is no doubt that the owner, in such a case, anticipated the presence of those intruders, and that being convinced that they would break into the property, he set up snares to trap them. The liability, therefore, arises from the fact that the presence of the trespassers had been anticipated.

The owner is also liable for the conditions created by him near public ways, as, for example, an excavation into which a person wandering off the road might inadvertently fall. Herein, likewise, his liability clearly arises from the fact that the presence of the trespasser had been anticipated.

The liability of a person who does not guard an instrumentality left by him in a public way and which is attractive to children—a liability admitted by some courts which have refused to award damages in cases where such attraction is within private property—is another case in which the duty towards the trespasser arises from the fact that his

presence and his coming in contact with the dangerous instrumentality have been anticipated. "It is not, then, reasonable," the said author asks, "to conclude that the reason why a trespasser cannot ordinarily recover for injuries sustained by reason of the condition of the property trespassed upon is not that he is a wrongdoer whose presence is unlawful, —for the person injured by the spring gun or mantrap, or who inadvertently strays from the highway, and the child who meddles with something in the street with which he has no business to meddle, are equally wrongdoers,—but that the real reason is that his presence is not to be anticipated, so that there is no duty to take precautions for his safety?"

Said author cites in support of his views the cases of *Johnson* v. *Atlas Supply Co.*, 183 S.W. 31, and *McAllister* v. *Jung,* 112 Ill. App. 138. In the last of these cases it is said that "a reason for the rule as to trespassers may perhaps be found, not necessarily in the fact that they are wrongdoers, but that by going, in pursuit of their own pleasure or convenience, upon the premises of another, who has a right to make a use of his own premises upon the presumption that strangers will keep away from a place where they have no right to be, such persons are not merely contributors to any injury they may there sustain, but active in inflicting the injury upon themselves except where wilfully or wantonly hurt."

The author concludes by saying that "the attractive-nuisance doctrine is not an exception to, but entirely in accord with, the general rule governing the liability of the landowner to trespassers, since it is essential to the operation of the attractive-nuisance rule that there must have been ground for anticipating the presence of children." We agree. If the owner of the property has grounds to anticipate the presence of children at the time he creates the dangerous condition, his duty is to adopt all due and reasonable precautions to avoid injury and save himself from liability. It does not matter if the child is a trespasser. It is

not necessary, therefore, that the dangerous condition should have induced him to enter upon the property. It is sufficient that his presence could have been reasonably anticipated. See Restatement, Torts, pp. 920, 921.

In the instant case we are not dealing with a trespasser. The child of the plaintiff lived in the property of the defendant heirship. The place where the defendant laid the track is the alleyway directly in front of the house where the plaintiff and her daughter lived, at a distance of approximately three meters from the track.

The death of the child occurred at the moment the drivers resumed their march after having stopped the cars during the time necessary to feed the oxen. No one saw the accident, but there were present at the scene, the witness for the plaintiff, Antonio Suárez, and the drivers Andrés Marcucci and Cornelio Colón, witnesses for the defendant. There were no other persons present.

Plaintiff Elvira Ramos testified that in the square where the wagons, oxen, and cars moved there were many children who went there to pick up sugar cane and to climb on the cars, and that sometimes those who conducted the vehicles would give them sugar cane so that they would go away.

The evidence shows that several children used to play in the square near the track over which the sugar-cane cars were hauled, even though this practice was prohibited by the defendant. In spite of this prohibition, the children of the neighborhood customarily ran after the cars in order to seize cane stalks or to climb on the cars, if the latter were empty.

Plaintiff's witness, Antonio Suárez, testified, among other things, that after he and the drivers finished feeding the oxen, he told them that they could proceed; that he then withdrew, and that when he turned around he saw a girl, Ana María Lugo, who was looking out of the window, put her hand on her forehead and cover her eyes; that then he saw the child rolling on the ground, and that he went there and

picked her up. He stated that in front of where he was nobody could be seen; that one could not see over the cars because, being quite high, they intercepted the view; that he did not see any child or any one else around there; that in order to come over from the oxen to the bolus, he had an open field of vision at any time he should look; that he did not see the child; that up to the place he could see and judge, the track offered no danger, and that, at least momentarily, there was no reason to presume that there was any danger; that he has seen children pulling out sugar cane and that he has scolded them; that he has seen empty wagons go by and the children steal a ride in them, and that he has scolded them because it is dangerous.

Andrés Marcucci, a cartman and witness for the defendant, stated, among other things, that the person in charge of the cattle, Antonio Suárez, told them that they must feed the oxen now that they had time for it; that then he went and got feed for the oxen which was distributed; that the witness fed the oxen standing on the left side and afterwards he changed to those on the right; that by that time they had pulled out the buggy which was stuck in the tracks; and that then Antonio Suárez passed by and said: "That's all, you can go on now"; that upon resuming their march they looked down the track but could see no one, and they proceeded up-hill with the cars; that "he did not see the child because he was tending the oxen and was not in a position to see her; that as he could see no one behind, naturally he saw no one"; that upon starting again they sat on the yokes attached to the oxen; that before sitting there he looked but saw no one; that the overseer's wife, who was on the balcony of one of the houses, said: "A wagon ran over a girl"; that they literally flew towards the right side and rushed to give their assistance; that Antonio Suárez had taken her in his arms and into the house.

Cornelio Colón, a driver employed by the defendant, testified, among other things, that at about 3 or 4 o'clock in the

afternoon they were conducting a sugar-cane train made up of five loaded cars; that they had to stop because they were harnessing a horse to a buggy which belonged to the overseer, and which had stuck on the track; that they fed the cattle and meanwhile the buggy was pulled out, and Antonio Suárez told them: "You can start now"; and that they began to move and they were a little further down when the overseer's wife cried out: "Stop, a car has run over a child"; that when he went to pick up the girl, Antonio had picked her up and was taking her in his arms up to her parents' house; that they stopped there for about ten minutes; that when he was about to proceed he looked along the track but he saw no one.

The lower court in its findings of fact held that it had been proved, among other things, that the place where the plaintiff's house was located was a sort of a village with a square, around which there were several establishments owned by the defendant, such as stores, overseer's houses, etc., and that in addition, at the edge of a road leading into said square, there were four houses of like appearance lying next to each other in line with the road; one of those houses was inhabited by the plaintiff; they also had there laborers' quarters, and children of all ages who lived in the neighborhood used to play in the space lying between the road and the square; that the child Juanita Ramos, shortly before the accident, was standing at about eight yards *(varas)* from her house accompanied by the plaintiff, who was washing clothes, and that the latter sent the child home to have some coffee, warning her to be careful; that the child went to the house and was behind the kitchen a very short while before the accident; that the place where the cars passed was dangerous for children and that the defendant had forbidden them to approach the cars to get sugar cane or for any other purpose; and that it was further proved that the overseer's wife herself did not allow her child to go down to the square of the settlement once the car traffic got started.

 The plaintiff invoked the attractive-nuisance doctrine. Although technically one can not consider a freight car loaded with sugar cane as an attractive nuisance, the truth is that it can not be denied that it is somewhat attractive to children. In the case of *Davis* v. *Malvern L. & P. Co.*, 186 Iowa 884, 173 N.W. 262, it is held that the doctrine should not be extended to the point of including all machines or objects capable of causing damage or injury to children, or that may in any manner attract them to the place of danger, inasmuch as it would be the same as imposing an unreasonable obligation on the owners of land, and to unduly restrict their use of such property.

In Restatement, Torts, par. 339, p. 925, an analysis and comparison is made of the risk to which the children will be exposed, with the utility which may be derived from the dangerous instrumentality, thus:

"In determining whether a particular condition maintained by a possessor upon land which he knows to be subject to the trespasses of children involves an unreasonable risk to them, the comparison of the recognizable risk to the children, with the utility to the possessor of maintaining the condition, is of peculiar importance. The public interest in the possessor's free use of his land for his own purposes is of great importance. A particular condition is, therefore, regarded as not involving unreasonable risk to trespassing children unless it involves a grave risk to them which would be obviated without any serious interference with the possessor's legitimate use of his land. Farming machinery and the like involve inevitable danger to children meddling with them. Nevertheless their essential importance to agriculture permits them to be used and maintained if kept in a proper place and in proper condition. On the other hand, if the installation of devices which would prevent the machine being set in motion were practicable without burdensome cost or serious interference with the utility of the machine, it might be unreasonable for a farmer to keep a machine without such equipment in a place notoriously open to trespassing children. A turntable may be essential to the proper functioning of the railway. The mere fact that it is maintained at a point where children are notoriously prone to trespass, would not of itself be sufficient to make the railroad

company liable under the rule stated in this Section. If, however, the turntable could be made safe even against meddling children by a simple locking device, it would be unreasonable to maintain a turntable at such a place without such a device . . .''

In accordance with the decisions cited, the degree of liability or care that should be exercised by the defendant varies in relation to the utility of the dangerous object. In the instant case, it can not be denied that the employment of railroad cars for the transportation of cane is useful to the defendant and to the industry in which it is engaged. It must also be admitted that the cane-sugar industry is useful to the community. It is not necessary, therefore, to expect extraordinary precautions on the part of the defendant, in the supposition that we are dealing with an attractive nuisance, because that would amount to unduly burdening an industry which is socially useful; but we firmly think that said defendant was bound to take all ordinary precautions that would tend to avoid injury provided they were reasonable, not too expensive, and that they would not destroy the usefulness of the instrumentality.

There is no doubt that sugar-cane cars, either empty or loaded, constitute an attraction to children. The defendant should have anticipated the presence of children at the place of danger and should have exercised due care to avoid accidents when the cars got under way. In our opinion, the liability of said defendant is manifest, whether we adopt the attractive-nuisance doctrine or whether we take as basis the general principles applicable in cases of negligence. The evidence shows that the drivers' attention was distracted by the feeding of the oxen. Although it has been shown that there were no children near the track at the time, the truth is that on other occasions they used to approach the place of danger, and that, as we have already said, the defendant should have anticipated the presence of children at that place. *Denver City Tramway Co.* v. *Nicholas*, 84 Pac. 813. The drivers should have been on the alert to prevent the children

living in the neighborhood of the tracks from coming to the place of danger. Had they exercised any measure of vigilance it is to be presumed that they would have seen the girl and avoided the accident that occurred when the cars were put in motion. This vigilance did not burden the defendant with an additional expense nor did it impose unreasonable precautions. *Louisville & N.R. Co.* v. *Steele,* 201 S.W. 43, 44, *et seq.*

The only precaution taken by the carters was to look, which they did at the moment they got under way and sat on the yokes. As they were engaged in feeding the oxen without watching for children that might approach the track, we do not think that they took the reasonable precautions which they should have taken and which, if adopted, would undoubtedly have avoided the accident.

Everything leads to the conclusion that the child stood in between two cars and was caught when the same started. The carters did not exercise due care because had they looked carefully and been attentive, they would have seen the girl and would have avoided the accident.

We are of the opinion that if there was reason to anticipate the presence of children, as happened here, the manner in which the child of the plaintiff approached the wagons is immaterial.

The judgment appealed from must be reversed and another rendered instead adjudging the defendant to pay to the plaintiff the sum of $2,500, with costs but excluding attorney's fees, as we think that due to the nature of the questions raised it can not be said that the plaintiff was obstinate *(temerario).*

Mr. Justice Wolf took no part in the decision of this case.

ON MOTION FOR REHEARING*

June 15, 1937.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the court.

The defendant asks for a reconsideration of our former judgment, and urges that we erred in disregarding and failing to weigh the following special defense set up in the answer to the complaint:

"The plaintiff, Elvira Ramos, on June 19, 1933, for a valuable and sufficient consideration, discharged and released the defendant from all actions, claims, and demands whatsoever to which she might be entitled, as mother with *patria potestas* over her minor child, Juanita Ramos, by reason of the accident which occurred on June 9, 1933, and of the death of said minor, and acknowledges under oath that the occurrence was only an unfortunate accident, and expressly relieves the defendant from all liability."

The attitude of the defendant surprises us. That question was never raised before this court. It is true that the plaintiff sought to overcome the defendant's defense by stating in her testimony before the trial court that she had accepted a check for $50 on the belief that she was receiving said amount from the defendant in payment of the expenses incurred by her by reason of the accident. The defendant offered in evidence a document signed by plaintiff Elvira Ramos acknowledging the receipt of $50 and relieving Sucesión J. Serrallés and the Maryland Casualty Company from all liability in connection with the accident occurred to her daughter.

The trial court rendered judgment for the defendant after hearing the evidence and without making any finding as to the defense set up by the party defendant. The defendant did not request the lower court to decide the question raised nor did it take any appeal on this point. In its extensive and

---

* NOTE.—At the request of Attorney Fernando B. Fornaris, the Court ordered that it should be noted in the record that said attorney had declined to act for the defendant in connection with the motion for rehearing in this case.

painstaking brief submitted to this court, the defendant says nothing about this defense. It is after the judgment of the lower court has been reversed that the defendant invokes the defense which was never raised in the briefs nor at the hearing had before this court. And it is precisely the party observing such conduct who now urges us to decide a question which it has impliedly abandoned.

In our opinion, the defendant, who did not call the attention of the lower court to this omission nor take an appeal to this court, lacks authority to request a reconsideration of the judgment on the basis of a question not urged in the original hearing.

Regarding the other points relied on by the appellee, we ratify the conclusions reached in our former opinion and judgment.

The reconsideration sought must be denied.