**UNITED STATES of America,
Defendant, Appellant,**

v.

**Donald K. SCHULTZ, etc., et al.,
Plaintiffs, Appellees.**

**No. 5597.**

United States Court of Appeals
First Circuit.

Oct. 6, 1960.

Peter Mills, U. S. Atty., Portland, Me., and Conrad K. Cyr, Asst. U. S. Atty., Bangor, Me., with whom Ronald A. Jacks, Attorney, Department of Justice, Alexandria, Va., was on brief, for appellant.

Robert C. Zampano, East Haven, with whom William A. Blank, Brooklyn, N. Y., and Philip M. Isaacson, Lewiston, Me., were on brief, for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

This is an appeal by the United States from a judgment entered against it in an action under the Federal Tort Claims Act. Title 28 U.S.C. §§ 2671–2680. The plaintiffs are a father and his minor son who were civilian residents of Portsmouth, New Hampshire. The son, who was fifteen years old at the time, was injured under the following circumstances while on government property annexed for administrative purposes to the Portsmouth Naval Shipyard in Kittery, Maine.

The minor plaintiff spent the night of April 27, 1953, in the quarters in the Shipyard provided by the Government for Captain McAfee, Supply Officer at the Yard, as the house guest of Captain McAfee's fourteen year old son, Robert. The boys with the two sons of Captain, subsequently Admiral, Ferriter, Administrative Officer in charge of the security of the Yard, who were then sixteen and eleven years old, and a fifteen year old friend and house guest of theirs from Portsmouth, laid plans to camp out the following night at Fort Foster, an abandoned coast artillery post on Gerrish Island, Maine, some five miles distant from the Yard by road, which had been transferred to naval jurisdiction.

Fort Foster consists of shore frontage, cleared land and some swamp. On it is a pistol range for training the Yard's security personnel with incidental storage facilities and abandoned gun emplacements. Except along its shore frontage, the Fort is enclosed by an eight-foot fence with barbed wire strung along the top. Gates at the two points of access to the Fort by road are kept locked, but it appears that entrance to the Fort can be gained either by crawling under the fence at various places or walking around it at low tide. Signs on the gates and at points along the fence give notice that the Fort is government property and forbid trespassing. Civilian security guards under the command of Captain Ferriter, who had keys to the Fort, patrolled it by automobile every two hours. Although not formally designated as a recreation area, it had been used for years by personnel stationed at the Portsmouth Naval Shipyard, and their families and guests, for camping, picnicking and bathing.

On the morning of April 28 Mrs. McAfee drove her son and the minor plaintiff to the City of Portsmouth where they purchased supplies for the proposed camping trip and picked up the minor plaintiff's camping equipment and 22 caliber rifle at his home. They also

picked up the camping equipment and 22 caliber rifle of the other Portsmouth boy at his home and then returned to the Yard where all the camping equipment including the guns was piled in plain view in the McAfee's back yard. The older Ferriter boy arranged for transportation to the Fort in a security patrol car on one of its regular trips and shortly after lunch the car arrived driven by a security guard and containing the Ferriter boys and their guest and their equipment, including three guns from the Ferriter house. The rest of the equipment was loaded into the vehicle and the boys were driven to the main gate of the Yard where the Marine guard on duty checked the boys' passes in the usual manner but asked no questions about the guns which he must have seen for they were in plain sight. The boys were then driven to Fort Foster where the security guard unlocked the gate and drove the boys to the site chosen for their camp where they unloaded their guns and equipment. The boys set up camp for the night and then the older Ferriter boy handed out approximately 100 rounds of ammunition to each boy except Robert McAfee who brought his own. The boys spent the afternoon in pairs, hunting and shooting at any target that appealed to them. On one occasion during the evening the regular two-hour security patrol of the Fort "checked in" on the boys and found all well.

The boys rose early the next morning and continued their hunting and shooting. About half past ten they packed their equipment beside the road for their return to the base in the patrol car on its next trip. While waiting for it the minor plaintiff and the other Portsmouth boy began to wrestle on top of a small knoll near by. The McAfee boy joined them for a while and then, seeing a loaded 22 caliber rifle lying on the ground decided to do some more shooting. At a point about fifty feet from the hill where the boys were still wrestling he threw a wad of paper into the air, took aim and fired. At that moment the minor plain-tiff stood up directly in the line of fire and the bullet hit him in the back inflicting the injuries for which he here seeks to recover.

The evidence is clear and the District Court found that the McAfee and Ferriter boys had frequently gone to Fort Foster before with their rifles, that the security guards were under standing orders to take the boys to the Fort on their routine patrols whenever the boys wanted to go, and that the boys on previous occasions had not only been careless but actually reckless in the use of their weapons at the Fort. There is also evidence and it was found that the parents of these boys knew that their sons took firearms to the Fort but there is no evidence that they knew that their boys used their weapons carelessly or recklessly. There is no evidence that either Captain McAfee or Captain Ferriter personally knew specifically that the boys were taking their guns on the particular trip involved. Nor is there any evidence that the senior plaintiff knew anything about the use of firearms by any one at the Fort, either on the occasion of the near fatal camping trip or before, or that the minor plaintiff either knew or from past experience should have known that the McAfee and Ferriter boys had been careless or reckless in their use of rifles at the Fort or elsewhere, for it was his first trip to the Fort with the boys.

The parties stipulated that at the time of the accident the minor plaintiff was at Fort Foster at the personal invitation and as a guest of the Ferriter and McAfee families. And the court below found that the boys were there with the full knowledge and acquiescence of responsible officials of the Yard from which it further found that they were at the Fort "with the implied and perhaps express consent of the Government." [174 F.Supp. 494] The court concluded from this "that the minor plaintiff's injuries were directly attributable to the negligent failure of responsible Government employees in their official capacities [Captain Ferriter as we have pointed out was in charge of securi-

ty at the Yard and at its appendage the Fort] to supervise or stop the dangerous practice which has been described [*i. e.* the negligent and reckless use of firearms at the Fort by the boys], and that defendant is responsible therefor." Wherefore it entered the judgment for the plaintiffs from which this appeal has been taken.

■ Under the Federal Tort Claims Act, Title 28 U.S.C. § 1346(b), the United States is liable to the plaintiffs if a private person would be liable under the law of the place where the act or omission occurred. The alleged act or omission occurred in Maine and the parties agree that Maine law applies even though the accident happened on government property.

■■ Turning to the law of Maine it is clear from a long line of cases, some of which will be mentioned presently, that there can be no actionable negligence unless there is a breach of some duty, and that the duty of a landowner to persons on his land varies according to the latter's status. Lewis v. Mains, 1954, 150 Me. 75, 104 A.2d 432, and cases cited. If one on another's land is an invitee, the landowner owes him the duty of using reasonable care for his safety. On the other hand, if he is merely a licensee or a trespasser, the landowner owes him no duty except not wantonly to injure him or to set traps for him. Nelson v. Burnham & Morrill Co., 1915, 114 Me. 213, 216, 95 A. 1029. See also Lewis v. Mains, supra, 150 Me. 76, 77, 104 A. 2d 433.

■ What, then, was the status of the minor plaintiff at Fort Foster? He was clearly not an express invitee of the United States Government. But he was at the Fort with the knowledge and acquiescence of responsible government officials. Of that there can be no doubt. And we may assume, although we do not need to decide, that their knowledge and acquiescence was that of the United States. But under the law of Maine a landowner's knowledge that another is on his land, or even the landowner's consent to another's presence on his property does not make the one on the land the implied invitee of the landowner. He does not invite persons to go on his land merely for their own convenience or to satisfy their curiosity. Stanwood v. Clancey, 1909, 106 Me. 72, 76, 75 A. 293, 26 L.R.A.,N.S., 1213, cited with approval in Lewis v. Mains, supra, 150 Me. 77, 104 A.2d 433, where it is said that "it is recognized that no implied invitation will arise without some mutuality of interest as between the visitor and the owner."

■ Perhaps a tenuous mutuality of interest might be found with respect to the minor plaintiff's visit to Captain McAfee's quarters in the Navy Yard. It may be, although we do not decide, that the Government derives some indirect advantage in the way of improved morale of its officials by allowing them to have civilian visitors in their quarters on government installations. But Fort Foster, although often used as a recreation area by naval families stationed at the Shipyard and their guests, was not designed or maintained or even designated for that purpose.

The recent case of Lewis v. Mains, to which we have frequently referred, is closely in point on its facts and rules the case at bar. In that case the father of the minor plaintiff was employed at the defendant's sawmill, and had been allowed by the defendant to build a house on sawmill premises. On the premises was an extensive sawdust pile crossed by a well defined path near the top of which were electric wires leading to the mill. The minor plaintiff, a little girl, climbed the pile following the path, came in contact with the wires and was seriously injured. The court rejected the attractive nuisance doctrine on the basis of prior authority and ruled that the only invitation given was to the father to build his house ánd live there with his family and that that invitation to the father did not constitute an invitation to his children to climb the sawdust pile. Nor, said the court, could an invitation to employees' children to climb the pile

be implied since in that respect there was no mutuality of interest between the defendant and the child. The court said at pages 77 and 78 of 150 Me., at page 434 of 104 A.2d quoting 38 Am. Jur. 761, "Where one enters a part of premises reserved for the use of the occupant and his employees and to which there was no express or implied invitation to go, there can be no recovery for resulting injury, even though he is an invitee to other parts of the premises." And at page 79 of 150 Me., at page 434 of 104 A.2d the court added: "Even if the declarations [the cases, that of the father and daughter, came up on demurrers] alleged enough to imply a permission to play upon the sawdust pile, which we do not think they do, plaintiff would fare no better. As a mere licensee, the child would go upon the pile at her own risk and be bound to take the premises as she found them."

In the case at bar there is no claim that any defect in the premises at Fort Foster caused the minor plaintiff's injuries. The claim is that responsible officials at the Portsmouth Navy Yard were derelict in their duty either in not preventing the boys from using firearms at the Fort at all, or in not providing adult supervision over their shooting. However, a landowner's duty may well embrace more than the mere physical safety of his premises. We may assume that under the law of Maine one who operates a shooting gallery for profit, or maintains a private game preserve to which hunters are admitted for a fee, is under a duty to supervise the use of firearms on his own premises, particularly the use of such weapons by minors. But it does not follow from this that a landowner who passively permits, or at least does not object to hunting or shooting on his land is under any duty to supervise the conduct of those who come on his land only for their own sport, be they minors or adults. The reason for this is lack of mutuality of interest. And we do not see that the situation would be any different if out of good nature the landowner, perhaps on his way home from town, gives a ride to boys or men knowing that they are on their way to his farm or woodlot to shoot for sport.

In the course of his argument, in response to a question from the court, appellees' counsel, correctly recognizing the force of some of the above, stated that the true nature of the Government's liability was not predicated upon ownership of Fort Foster, but would have been the same if Captain Ferriter had sent the boys to another island, not owned by the Government. We construe this to mean that the Government should be held liable for having furnished recreational facilities, government owned or otherwise, with dangerous accompaniments, that is to say, youngsters with rifles. Passing the question of whether the record discloses sufficient knowledge on the part of Captain Ferriter of the propensity of these boys to use 22 caliber rifles dangerously, or the correctness of a ruling that 15 and 16 year old boys are, per se, not to be so trusted, Captain Ferriter was not an agent of the Government, in other words, it was beyond the scope of his authority to bind the Government with responsibility therefor, to furnish the minor plaintiff with private recreational facilities. The Government cannot be held as a landowner. Neither can it be held as principal for the act of a member of the armed forces engaged purely in entertaining guests of his son.

Judgment will be entered vacating the judgment of the District Court and remanding the case to that Court for the entry of a judgment for the defendant.