Dale WALKER and Liana Walker,
Plaintiffs, Appellants,

v.

GENERAL ELECTRIC COMPANY,
Defendant, Appellee.

No. 91–2081.

United States Court of Appeals,
First Circuit.

Heard May 7, 1992.

Decided July 7, 1992.

Harold L. Stewart, II with whom Stewart Law Office was on brief for appellants.

Bernard J. Kubetz with whom Eaton, Peabody, Bradford & Veague, P.A. was on brief for defendant, appellee.

Before CYR, Circuit Judge, CAMPBELL, Senior Circuit Judge, and FUSTE,* District Judge.

FUSTE, District Judge.

Plaintiffs Dale and Liana Walker commenced this action in the Superior Court of Maine against General Electric Company ("GE" or "General Electric"), alleging various causes of action sounding in tort,[1] all of which were based on a claimed malfunction of a GE-manufactured toaster-oven. Plaintiffs alleged that the toaster-oven's malfunction was due to a defect in its design or manufacture and that this defect was the proximate cause of a fire which destroyed the Walker family residence. Defendant General Electric removed the case to the United States District Court for the District of Maine pursuant to 28 U.S.C. §§ 1332, 1441. At the conclusion of plaintiffs' presentation of their case at trial, defendant moved for a directed verdict pursuant to Fed.R.Civ.P. 50(a) which the court, after hearing argument from the parties, granted. Plaintiffs appeal this determination. Finding no error in the court's ruling, we affirm.

## I.

### Background

In 1983, the Walkers won a General Electric Model T–50 toaster-oven, manufactured in 1982, as a door prize at a company party. From 1983 until the date of the fire, February 26, 1990, there was uncontradicted testimony that the Walkers used the appliance daily; that it functioned properly; and that it never required repair. In 1985, the Walkers moved into a house at 29 North Main Street, Pittsfield, Maine. The toaster-oven was stored in the kitchen, on a narrow sideboard, to the left of the sink. Mrs. Walker testified that the toaster-oven remained plugged into the lower socket of an electrical outlet when not in use. There was also testimony that, at times, she had to unplug the toaster-oven from the lower socket and move it to the upper socket because the lower one did not always function.

On February, 26, 1990, the date of the fire, Liana Walker testified that, prior to taking her children to a doctor's appointment, she had used the toaster to make toast for herself. Almost the last thing she did before leaving the house was to remove the toast from the toaster-oven. Since she was rushing to get her children ready to leave, she could not remember whether she heard the toaster's bell ring, signalling that the toast cycle had finished; nor did she recall whether she herself had shut off the toaster-oven before exiting the kitchen. Mrs. Walker left the house around 7:30 A.M. with her children and, after the doctor's appointment, took them to school. Arriving at the school around 8:40 A.M., she was informed by a school official that her house was on fire.

Jennifer Mills, an investigator with the Maine State Fire Marshal's office, testified that, based on her investigation of the fire scene at the Walker's residence, the fire originated in the area where the toaster-oven was located. She further opined that the presence of either the toaster-oven itself or the outlet into which it was plugged could have served as the source of ignition for the fire, since they were both within the

---

* Of the District of Puerto Rico, sitting by designation.

1. Plaintiffs alleged causes of action based on negligence, strict liability, breach of express warranty, and breach of implied warranties of fitness and merchantability. At trial, plaintiffs withdrew their express warranty claim.

four-foot area where the fire started. Lisa Fraser, a fire analyst hired by the homeowner's insurance carrier to investigate the fire, generally concurred with the fire marshal's opinion, the one difference being that Ms. Fraser found the area of origination to be three feet in diameter, thus encompassing the area where the toaster-oven was stored, but not the outlet.

Harry Albinger, an electrical engineer and a retired General Electric employee, also testified with respect to the operation of the toaster-oven. He first described the toaster-oven's three sets of controls corresponding to each of the appliance's functions—toaster, oven, and broiler. Depending on the use mode, when turned on, some or all of the appliance's electrical resistance heaters, also known as calrods, would heat up. He further explained how each of the toaster-oven's components functioned and how the appliance's controls allowed the user to adjust the amount of heat that would be applied in making toast. He also described the toaster-oven's various shut-off mechanisms. Based on his analysis of the remains of the toaster-oven, especially the components of the solenoid assembly, Albinger concluded that the appliance was on at the time the fire commenced. When asked why the toaster-oven had remained on longer than the normal three-to-four minute period necessary to make toast, he attributed it to a malfunction in one of the automatic shut-off systems.

On cross-examination, Albinger was asked if he could point to any specific defect in the product based on manufacturer error and he responded that he could not;[2] nor could he point to any design error on the part of General Electric which might have caused the malfunction. He also testified that he knew of no act of negligence on General Electric's part in the design or manufacture of the toaster-oven.

After plaintiffs rested their case, defendant moved for a directed verdict on all the causes of action alleged. General Electric first argued that plaintiffs had presented no evidence showing that the toaster-oven was the proximate cause of the fire. The district court rejected this argument pointing to the testimony of the fire marshal and the fire investigator which placed the appliance in the area where the fire originated. The court noted that, based on this evidence, a jury could reasonably infer that the toaster-oven caused the ignition of the fire.

Defendant next argued that plaintiffs had also failed to come forward with any evidence establishing that General Electric was in any way negligent in the design or manufacture of the toaster-oven. Defendant also argued that plaintiffs had failed to establish any design or manufacturing defect that would allow them to go forward on theories of strict liability or breach of implied warranties of fitness and merchantability. After hearing plaintiffs' argument—that proof of malfunction in the automatic shut-off system is a sufficient evidentiary basis for a finder of fact to infer manufacturing or design defect—the court concluded that, while plaintiffs had come forward with sufficient evidence to go to the jury with the issue of whether a malfunction in the toaster-oven had occurred, there was no evidence that defendant had violated the standard of due care in the design or manufacture of the toaster-oven, and consequently, defendant could not be held liable under a theory of negligence. With respect to the other theories of liability, the court found that plaintiffs failed to present sufficient evidence showing defect, a necessary element to establish each of the remaining causes of action. Accordingly, the district court granted defendant's Fed.R.Civ.P. 50 motion.

## II.

### Standard of Review

■ The standard of review applicable in the Fed.R.Civ.P. 50 context is clear. To uphold a directed verdict, we must find that, viewing the evidence in the light most favorable to the non-moving party and giv-

---

**2.** His precise answer was: "Oh no, I'm sure the product was in good operating condition, it had worked well for 6 years. This was a malfunc- tion which occurs, that's why you have repair stations and why you repair appliances." (Trial Transcript at 178).

ing the same the benefit of every legitimate inference, reasonable jurors could come to but one conclusion. *DiPalma v. Westinghouse Electric Corp.*, 938 F.2d 1463, 1464 (1st Cir.1991); *Goldstein v. Kelleher*, 728 F.2d 32, 39 (1st Cir.), *cert. denied*, 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). We have also held, however, that "such inferences may not rest on conjecture or speculation, but rather the evidence offered must make 'the existence of the fact to be inferred more probable than its nonexistence.'" *Goldstein*, 728 F.2d at 39 (quoting *Carlson v. American Safety Equipment Corp.*, 528 F.2d 384, 386 (1st Cir.1976)).

## III.

### *Discussion*

### A. *Strict Liability and Breach of Implied Warranties Theories*

In Maine, claims based on a theory of strict liability are governed by statute. Section 221 of Title 14 provides:

One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume, or be affected by the goods, or to his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold. This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Me.Rev.Stat Ann. tit. 14, § 221 (West 1980). Products will be considered in a defective condition unreasonably dangerous to users or consumers either where

error was committed in the manufacturing or design process or where the manufacturer or supplier failed to warn of a product hazard. *Bernier v. Raymark Industries, Inc.*, 516 A.2d 534, 537 n. 3 (Me.1986); *Austin v. Raybestos–Manhattan, Inc.*, 471 A.2d 280, 288 (Me.1984) ("Products placed in commerce are presumed to be reasonably safe. Section 221 places an obligation on manufacturers and suppliers to market reasonably safe products."). In determining whether a product is sold in a defective condition unreasonably dangerous to the user, plaintiff must establish that the product was defectively designed, thereby exposing the user to an unreasonable risk of harm. *St. Germain v. Husqvarna Corp.*, 544 A.2d 1283, 1285 (Me.1988); *Stanley v. Schiavi Mobile Homes, Inc.*, 462 A.2d 1144, 1148 (Me.1983). Such proof involves an examination of the utility of the product's design, the risk of such design and the feasibility of safer alternatives. *Stanley*, 462 A.2d at 1148. Even where a product is faultlessly made, it may be deemed "defective" under section 221 if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning and the product is supplied without such warning. *Lorfano v. Dura Stone Steps, Inc.*, 569 A.2d 195, 196 (Me.1990); *Bernier*, 516 A.2d at 538. Likewise, plaintiff must show some defect in the product at the time it was sold in order to maintain a claim for breach of the implied warranties of merchantability [3] and fitness for particular purpose.[4] *Lorfano*, 569 A.2d at 197. *See also, Faulkingham v. Seacoast Subaru, Inc.*, 577 A.2d 772, 774 (Me.1990) (merchantability); *Sylvain v. Masonite Corp.*, 471 A.2d 1039, 1040–41 (Me.1984) (same).

At trial, plaintiffs' expert witness provided testimony that would have allowed a jury to infer that the toaster-oven malfunctioned. However, when asked whether there was a defect in the appliance, he answered that he could find no such defect in either its design or manufacture. Because of this, he could not deter-

---

**3.** Section 2–314 of Maine's version of the Uniform Commercial Code provides for the implied warranty of merchantability in all contracts of sales, subject to certain exclusions or modifica-

tions. Me.Rev.Stat.Ann. tit. 11, § 2–314 (West 1964).

**4.** Me.Rev.Stat.Ann. tit. 11, § 2–315 (West 1964).

mine the cause of its alleged malfunction. Further, the evidence was uncontroverted that the toaster-oven had functioned on a daily basis for over six years without incident. Based on these facts, the district court committed no error in finding that there was insufficient evidence with respect to the element of defect.

■ Relying on a Third Circuit case interpreting Pennsylvania's products liability law, plaintiffs argue that the application of "a malfunction theory"—whereby proof of a malfunction may be used as evidence to establish a defect—provided a sufficient evidentiary basis to allow the case to go to the jury on the issue of defect. *Sochanski v. Sears, Roebuck & Co.*, 689 F.2d 45 (3d Cir.1982); *Knight v. Otis Elevator Co.*, 596 F.2d 84, 89 (3d Cir.1979). We disagree.

In *Sochanski*, the court carefully specified that the "malfunction theory" did not alter the requirements of section 402(A) of the Restatement (Second) of Torts (also the basis for Maine's strict liability statute). *Sochanski*, 689 F.2d at 50. The court was clear that "[e]vidence of a malfunction, then, is not a substitute for the need to establish that the product was defective." *Id.* In a later Third Circuit case, the court explained that Pennsylvania's "malfunction theory" is simply a specific application of the general rules of proof in products liability cases in that a plaintiff may meet the burden of proving a defect either by pointing to some specific dereliction by the manufacturer in the design or construction of the product or "by showing an unexplained occurrence and eliminating all reasonable explanations for the occurrence other than the existence of a defect." *Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp.*, 726 F.2d 121, 124 (3d Cir.1984). Plaintiff remains with the burden of negating other reasonable explanations for the malfunction. *Id.* The court concluded:

> Thus, the malfunction theory in no way relieves the plaintiff of the burden of proving a defect: it simply allows him to show that a defect is the most likely explanation for an accident by eliminating other reasonable explanations. (cites omitted). The plaintiff still must satisfy

the burden of proving that a defect is the most likely cause of the accident, and therefore must negate the likelihood of other reasonable causes.

*Id.* at 125.

Plaintiff's only evidence of malfunction or defect was Albinger's testimony. He could find no defect in the appliance. He further testified that the solenoid assembly and other shut-off mechanisms will sometimes simply "wear out" and will need to be replaced. Here we are dealing with a toaster-oven that was used on a daily basis for over six years. Plaintiffs' own expert testimony points to another reasonable explanation for the toaster-oven's alleged malfunction. Therefore, even if we were to borrow from Pennsylvania law, plaintiffs failed to meet their burden of proof in establishing the element of defect since they failed to exclude other reasonable explanations for the malfunction.

## B. *Negligence Claim*

In order to establish negligence under Maine law, a plaintiff must show (1) a duty owed to plaintiff by defendant; (2) a breach of that duty; and (3) that the breach was the actual and legal cause of plaintiff's injury. *Parker v. Harriman*, 516 A.2d 549, 550 (Me.1986); *Adams v. Buffalo Forge Co.*, 443 A.2d 932, 938 (Me.1982). *See also*, W. Prosser and W. Keeton, *The Law of Torts* § 30 at 164–65 (5th ed. 1984). There can be no actionable negligence unless some duty is breached. *United States v. Schultz*, 282 F.2d 628 (1st Cir.1960) (interpreting Maine law), *cert. denied*, 365 U.S. 817, 81 S.Ct. 698, 5 L.Ed.2d 695 (1961).

Here, the district court's dismissal of the negligence claim was based on plaintiffs' failure to come forward with any evidence establishing that defendant violated the standard of care in its manufacture or design of the toaster-oven. Plaintiffs' own expert witness unequivocally testified that he could find no evidence of negligence on General Electric's part and, because of this fact, could not determine precisely what caused the toaster-oven's malfunction. Absent such evidence, plaintiffs failed to establish that General Electric breached its

duty of care. The district court was correct in directing the verdict with respect to plaintiffs' negligence claim.

The district court's judgment is *affirmed*.