Elvira Ramos, demandante y apelante, *v.* Sucesión de J. Serrallés, demandada y apelada.

Núm. 6946.—*Sometido:* Febrero 11, 1937. *Resuelto:* Abril 22, 1937.

344

*Cayetano Coll Cuchí* y *Víctor A. Coll,* abogados de la apelante; *Fernando B. Fornaris,* abogado de la apelada.

El Juez Asociado Señor Córdova Dávila emitió la opinión del tribunal.

Elvira Ramos solicita indemnización por daños y perjuicios por la muerte de una hija de tres años y medio de edad que atribuye a la negligencia de la parte demandada. La corte inferior declaró sin lugar la demanda y la demandante ha establecido el presente recurso de apelación.

La sociedad demandada se dedica, entre otras actividades, a la siembra de caña y a la producción de azúcar. En una de sus plantaciones, denominada Colonia Segunda Cintrona, existe un poblado donde viven empleados y peones de la demandada que trabajan en dicha colonia. Este poblado consiste mayormente de un callejón o plazoleta a lo largo del cual se agrupan dos hileras de establecimientos, incluyendo una tienda, un cuartel para peones, la casa del mayordomo y varias casas habitaciones. En una de estas habitaciones vivía la demandante al ocurrir los hechos origen de este litigio. En el vecindario habitan niños de distintas edades, quienes suelen jugar en el referido camino o plazoleta.

Todos los años, en el período de la zafra, la demandada acostumbra tender una vía férrea portátil que comienza desde la pieza de caña inmediata al caserío, pasa a lo largo del callejón o plazoleta que separa los mencionados establecimientos, y empalma con las vías principales de su ferrocarril. La demandada transporta por dicha vía la caña de dicha pieza en vagones de ferrocarril tirados por yuntas de bueyes. Luego engancha estos vagones a una máquina de vapor y los lleva a la factoría.

En la zafra del año 1933, la demandada tendió esta vía a lo largo del callejón. El día 9 de junio de 1933, se estaba transportando caña en cinco vagones tirados por tres yuntas de bueyes conducidas por dos carreteros. Como a las tres y media de la tarde de ese día, los carreteros se vieron obligados a detener los vagones, por hallarse una calesa en medio de la vía. El último de los vagones quedó estacionado más o menos al frente de la casa de la demandante. Un peón encargado de cuidar del ganado aprovechó esta oportunidad para con la ayuda de los carreteros dar alimento a las yuntas de bueyes. Una vez terminada su labor, dicho peón dió aviso a los carreteros para que reanudaran la marcha. No bien comenzaron a moverse los vagones, tuvieron que ser detenidos, al escucharse los gritos de una señora que desde el balcón de su casa avisaba que uno de los vagones había

atrapado una niña. Al volver la vista el peón encargado del ganado y ver a Juanita Ramos, hija mayor de la demandante, revolcándose sobre la vía, corrió en su auxilio. La niña murió aquella misma tarde a consecuencia de las heridas recibidas.

La parte apelante se querella de que no se hayan aplicado a este caso las doctrinas de peligro atrayente (*attractive nuisance*) y *res ipsa loquitur.*

Los tribunales que han adoptado la primera de dichas doctrinas han decidido que cuando una persona crea en su propiedad o en la de otro o en un sitio público una condición peligrosa capaz de atraer niños de tierna edad, esa persona está obligada a tomar aquellas precauciones que razonablemente aconseja la prudencia para evitar daño a los niños que acudan o puedan acudir al sitio de peligro.

Esta corte, en *Rivera* v. *P. R. Drug Co.,* 32 D.P.R. 510, hace una relación del criterio sustentado por importantes tribunales, transcribiendo sus puntos de vista sobre esta importantísima cuestión y acepta esos principios en esta jurisdicción. También en casos posteriores ha sido ratificada esta doctrina. *González* v. *P. R. Ry. Light & Power Co.,* 34 D.P.R. 573, *Alvarez* v. *Santa Isabel Sugar Co.,* 37 D.P.R. 105, *Acosta* v. *P. R. Ry. Light & Power Co.,* 37 D.P.R. 414; *Berríos* v. *Garáu,* 46 D.P.R. 799.

Son numerosas las decisiones judiciales sobre esta debatida cuestión y muy diversos y variados los comentarios a que ha dado lugar. Aún en aquellas jurisdicciones en que la doctrina ha sido aceptada, las cortes no se muestran completamente conformes en cuanto a las condiciones bajo las cuales debe ser aplicada.

El Juez Clarke, en su opinión disidente en el caso de *United Zinc & Chemical Co.* v. *Van Britt,* 258 U. S. 268, 36 A.L.R. 32, nos dice que las cortes del país se han dividido con respecto a los principios de ley aplicables a los casos de peligro atrayente. "A la cabeza de un grupo," dice, "desde el año 1873 hasta hoy, la Corte Suprema de los Esta-

dos Unidos ha aplicado lo que ha sido designado como la doctrina humana. En el lado opuesto y a la cabeza del otro grupo, aparece la Corte de Massachusetts, aplicando lo que ha sido designado como una doctrina severa y draconiana.''

Es cosa sabida que la Corte Suprema de los Estados Unidos adoptó por primera vez esta doctrina en el caso de *Sioux City, etc. P. R. Co.* v. *Stout,* 17 Wall. 657, 21 L. ed. 745, decidido en 1873. Su origen se remonta al año 1841, en que se decidió el caso de *Lynch* v. *Nurdin,* 1 Q.B. 29, 113 Eng. Reprint 1041. Desde que la referida doctrina halló cabida en la jurisprudencia americana, ha sido objeto de críticas y encomios que han tratado de poner de relieve su fortaleza y su debilidad. Es innegable que la doctrina ha sobrevivido a la crítica severa de que ha sido objeto en un número de jurisdicciones, que ha demostrado su vitalidad en el hecho de su supervivencia, y que está inspirada no solamente en sentimientos de humanidad sino también en principios de justicia y de innegable legalidad.

En el caso de *Lucas* v. *Hammond,* 150 Miss. 369, resuelto en 1928, se dice que la doctrina ha sido repudiada por una mayoría de los tribunales y que necesita una exposición muy cuidadosa para no convertirla en un requisito injusto e impracticable. No compartimos esta opinión. Es verdad que la referida doctrina ha sido repudiada por tribunales tan importantes como los de Massachusetts, New Jersey, New York y Pennsylvania, aunque estos dos últimos estados no han dejado de sentirse influídos por sus principios en los casos en que el peligro atrayente se encuentra localizado en un camino público o en cualquier sitio donde el niño tiene derecho a estar; pero no es menos cierto que tribunales prestigiosos se han declarado partidarios de la doctrina en cuestión y que éstos exceden en número a los primeros. Lo que sí puede decirse es que hay cierta tendencia a restringirla más bien que a ensancharla.

El argumento principal en contra de la adopción de esta doctrina por los tribunales que la repudian es que la misma

constituye un ataque contra la santidad de los derechos dominicales del dueño de la propiedad.

"Esta regla," dice la Corte Suprema de Maine en *Nelson* v. *Burnham & M. Co.,* 114 Me. 213, 95 Atl. 1029, "constituye una innovación sobre los principios del derecho común. Nunca se pensó, hasta los años más recientes, que el dueño se viera en circunstancia alguna obligado a proteger a los intrusos (*trespassers*), ya se tratase de adultos o de niños. La regla convierte lo que puede ser considerado como un deber sentimental en un deber legal, e infringe el saludable y necesario principio de que el dueño puede hacer lo que le plazca en su propiedad en tanto en cuanto no intervenga con los derechos legales de otro. Esta regla constituye una restricción injustificable sobre el derecho de un dueño para conducir sus negocios en la forma que crea conveniente. Al mismo tiempo que constituye una carga sobre sus negocios, favorece al intruso que en violación de sus derechos penetra en la propiedad."

Tras este reducto de la propiedad individual y de su libre disfrute por el dueño, se abroquelan los tribunales que se resisten a la aplicación de esta doctrina.

En un artículo publicado por Jeremías Smith en 11 "Harvard Law Review" 349, se analizan ambos puntos, el que se relaciona con el uso de la propiedad y con el daño que ese uso pueda ocasionar en determinadas circunstancias. Aunque el Juez Smith se expresa con bastante imparcialidad, sus argumentos parecen favorecer la tendencia de los tribunales que se acogen a la teoría tradicional del dominio para negarse a aceptar principios basados, según la Corte Suprema de Maine, en lo que puede considerarse como un deber sentimental. Este deber, según dicho tribunal, infringe el principio de que el dueño puede hacer lo que le plazca en su propiedad en tanto en cuanto no intervenga con los derechos legales (*legal rights*) de otro. Y ¿qué se entiende por derechos legales? Aquí está precisamente la muralla que se interpone para que estos tribunales acepten la referida doc-

trina. Un niño, por tierna que sea su edad, que penetra en el territorio de otro es simplemente un intruso (*trespasser*) y por esta razón el dueño de la propiedad que crea en la misma una condición peligrosa, no contrae responsabilidad por los daños que ocasione a ese niño en virtud de la atracción, toda vez que, siendo el niño un intruso, a juicio de esos tribunales no puede decirse que se haya intervenido con sus derechos legales. La ley tiende a establecer reglas para preservar la vida y proteger a los seres humanos de serios daños corporales, y no parece que este propósito quede cumplido, cuando se permite al dueño el uso de su propiedad, sin adoptar las debidas precauciones, a sabiendas de que ese uso puede ocasionar el sufrimiento de un grave daño a los niños de cierta edad que penetren en sus dominios. La doctrina está basada en un sentimiento humano, pero no por eso dejan sus principios de ajustarse a la legalidad. La humanidad y la ley no pueden estar en pugna. Ambas cosas resultan completamente compatibles, siendo esta compatibilidad necesaria en ciertos casos para la protección de la vida y para evitar que pueda ocasionarse grave daño corporal.

El eminente tratadista Francis H. Bohlen, Profesor que fué de la Universidad de Harvard y que lo es en la actualidad de la Universidad de Pennsylvania, en un artículo que acaba de publicarse en 50 "Harvard Law Review" 737, se expresa así:

"Sin embargo, la más grande irrupción en la tradicional inmunidad de un poseedor de terreno es la llamada doctrina del peligro atrayente que, al igual que muchas nuevas doctrinas, ha sido extravagantemente extendida y arbitrariamente restringida en los estados que la han adoptado. De la confusión de casos innumerables han surgido ciertos puntos de guía o una más o menos definida aproximación a la solución de cada caso individual. Dos requisitos son esenciales para determinar la responsabilidad; primero, que se mantenga una condición en la propiedad que sea claramente conocida como peligrosa para aquéllos que se acerquen a ella ignorando el carácter peligroso de la condición, y, segundo, la probabilidad de que niños, incapaces de darse cuenta del peligro, penetren en la propiedad y sean tentados a caer en el peligro. Contra estos dos factores, que

determinan la magnitud del riesgo, se opone la necesidad de permitir a los dueños del terreno hacer uso del mismo en la forma que deseen y por lo tanto debe tenerse en cuenta la intervención de ese uso razonable que puede ser limitado por las precauciones necesarias para evitar el peligro de la condición. Es inevitable que en la aplicación de este método los resultados variarán en las diferentes jurisdicciones de acuerdo con el relativo valor que en cada caso se preste a los dos intereses en conflicto, para garantizar la seguridad de los niños y el interés de permitir la mayor libertad al propietario. Aun en aquellas jurisdicciones en que la doctrina del peligro atrayente ha sido repudiada, hay casos que aplican sus básicos principios cuando el peligro es extremo y los medios de prevenirlos ligeros, o cuando el peligro se mantiene en una estrecha proximidad a un camino o a otro sitio públicos.

''Todos estos casos en que el dueño de la propiedad ha sido responsable a un intruso, adulto o infante, constituyen una amplia desviación de la soberanía del dominio tradicionalmente adscrito al dueño del terreno. Si el dueño es soberano en su propio dominio, las leyes del Rey no pueden interponerse en su camino (una idea análoga a la que todavía domina la ley relativa a daños ocasionados y recibidos dentro del círculo de la familia), y en lo que a los tribunales del Rey concierne, el dueño puede hacer lo que le plazca a menos que haya hecho que su terreno caiga dentro de la jurisdicción de dichas cortes permitiendo la entrada de personas que no sean miembros del grupo de su hogar. Es lamentable que esta antigua idea de la santidad peculiar del dominio del propietario haya echado tan profundas raíces en muchas partes de los Estados Unidos. Y es aún más lamentable que la devoción a este principio de dominio público de un gran juez haya dado lugar a que la Corte Suprema de los Estados Unidos adopte una limitación sobre la doctrina del peligro atrayente que no se relaciona con las únicas razones que pueden servir de apoyo a dicha doctrina. En *United Zinc & Chemical Co.* v. *Britt,* la Corte Suprema de los Estados Unidos, en una opinión emitida por el Juez Holmes, cuyo criterio en materias públicas de importancia general es tan excelente, niega indemnización porque el demandante no tenía conocimiento de que las aguas del tanque en que se bañó estuviesen envenenadas, hasta después de haber penetrado como un intruso en el terreno del demandado. De modo que la doctrina del peligro atrayente fué restringida a casos en los cuales puede considerarse que los dueños han atraído al demandante sobre su propiedad por algún acto que mediante un *tour de force* lo hizo caer dentro de la categoría de invitación, consentimiento o tentación.''

En la opinión criticada por el comentarista, el Juez Holmes afirma que el deber de un dueño hacia un invitado de no inducirlo a caer en una trampa está firmemente establecido y que si bien es cierto que tentación no equivale a invitación, puede sostenerse que establecer y exponer a sabiendas, sin cercas, algo que seguramente ha de atraer a los niños en una edad en que ellos han de seguir la carnada mecánicamente, como un pez, tiene el efecto legal de una invitación, aunque no lo tenga con respecto a un adulto. Añade que el principio debe ser cautelosamente aplicado. Conviene advertir que en el referido caso disintieron el Juez Presidente Taft y los Jueces Asociados Day y Clarke, siendo este último quien escribió la opinión disidente.

Como se ve, el Juez Holmes toma como base para formular sus conclusiones el principio establecido de la invitación a un niño que estando fuera de la propiedad se siente atraído por el peligro. Cuando el niño penetra en los terrenos del dueño antes de percatarse de la condición creada, no surge responsabilidad de parte del segundo. Partiendo de esa base, no es extraño, aunque parezca injusto, que se sostenga el principio de que el dueño no tiene deber alguno con respecto al niño que después de haber penetrado en su propiedad, fué atraído por el peligro, toda vez que en estas condiciones no puede considerársele técnicamente como un invitado para invadir la propiedad.

Sobre este punto se hace el siguiente comentario en una nota que aparece en 36 A.L.R. 137:

"La razón de la presencia del niño tiene importancia únicamente para determinar si esa presencia pudo haber sido razonablemente anticipada. Debe, sin embargo, admitirse que algunas cortes han sostenido que es esencial a la responsabilidad que la presencia del niño se haya debido a la atracción. Este punto de vista es una consecuencia lógica de la doctrina de la invitación implícita, puesto que un niño cuya presencia no se atribuye a la atracción no puede decirse que ha aceptado la invitación extendida a él por la misma. Este punto de vista se basa también en la teoría de que el deber del dueño se limita solamente a los niños que son inducidos por la atracción, de

modo que no existe tal deber para aquellos niños cuya presencia no puede atribuirse a esa atracción. Pero este criterio parece constituir una concepción muy limitada de los deberes del dueño y es incompatible con la teoría (aceptada en *Atlanta & W.P.R. Co.* v. *Green,* 158 C.C.A. 632, 246 Fed. 676) de que una persona lesionada por acudir al rescate de un niño que ha sido inducido por la atracción a un sitio de peligro, puede obtener indemnización. En principio, por lo tanto, parece que si hubo razón para anticipar la presencia de niños, no tiene importancia la forma y manera en que el niño lesionado vino a la propiedad.''

Esta es, a nuestro juicio, la doctrina más aceptable. La otra descansa en la falacia de una invitación que no existe y que lógicamente no puede existir en el campo de la realidad. Lo natural es que el dueño del terreno esté deseando que no penetren niños en su propiedad, sin que pueda decirse que surge un consentimiento tácito del hecho de la atracción. El dueño puede, como con frecuencia se hace, colocar letreros en su propiedad haciendo constar que está prohibido el paso. Esta es una demostración expresa de su estado de ánimo. ¿Puede decirse que ha existido invitación, por el hecho de que la persona que penetra en su finca sea un niño que se siente atraído por la condición peligrosa? Indudablemente que no. Esta falacia ha dado origen a extravíos y confusiones que han complicado la aplicación de la doctrina del llamado peligro atrayente y que han dado lugar a que se hayan enunciado teorías a todas luces lamentables, porque apartándose de la realidad, no cubren todos los casos que tienen derecho a ser colocados bajo el palio protector de la ley.

Estimar que el niño, para que surja responsabilidad, ha sido atraído a la propiedad por algún acto que mediante un *tour de force* pueda caer en la categoría de invitación, consentimiento o tentación, no es una buena doctrina, como apunta el Profesor Bohlen y como sostiene el comentarista en la nota que aparece en el tomo 36 A.L.R. 292.

De acuerdo con el derecho común, el dueño u ocupante de la propiedad únicamente tiene para con el intruso el deber de abstenerse de causarle daños maliciosa o aviesamente

(*wilful and wanton injury*). Esta regla se basa en que el dueño tiene derecho a presumir que las demás personas obedecerán la ley y se abstendrán de penetrar en su propiedad.

Para eludir esta regla con respecto a los niños de corta edad ha surgido la teoría de que los mismos no son técnicamente intrusos, debiendo considerárseles como invitados. Según el comentarista, un examen del deber hacia los intrusos demuestra que no es necesario hacer una excepción en favor de los niños de corta edad. "¿Bajo qué circunstancias," se pregunta, "es responsable el dueño u ocupante de propiedad privada para con un transgresor adulto?" De un lado tenemos que el dueño es responsable por lesiones ocasionadas a un transgresor por medio de escopetas automáticas (*spring guns*) o trampas mecánicas (*man-traps*).

En el caso de *United Zinc & Chemical Co.* v. *Britt*, supra, se dice que esta responsabilidad no surge del hecho de que el dueño se ha basado en la presunción de que las personas obedecerán la ley y no penetrarán en la finca, sino por el contrario, en el hecho de haber esperado al transgresor y preparado un artefacto para causarle daño. De modo que en este caso se descarta la presunción y se exige responsabilidad al dueño por haber preparado adrede y premeditadamente un artefacto para causar daño a los intrusos. No hay duda de que el dueño en este caso ha anticipado la presencia de esos intrusos y de que estando seguro de su penetración en la finca ha preparado trampas para atraparlos. La responsabilidad, por lo tanto, surge, a pesar de ser transgresor, por el hecho de haberse anticipado la presencia de los intrusos.

También es responsable el dueño de las condiciones por él creadas en la proximidad a las vías públicas, como, por ejemplo, una excavación dentro de la cual pueda caer inadvertidamente una persona que se desvíe de la carretera. Aquí, igualmente, su responsabilidad surge claramente del hecho de que la presencia del transgresor ha sido anticipada.

La responsabilidad de una persona que deja de proteger algún aparato que ha dejado en la vía pública, y que resulta atractivo para los niños—responsabilidad que ha sido reconocida por algunas de las cortes que han negado indemnización cuando tal atracción se halla dentro de la propiedad privada—es otro caso en que el deber para con el transgresor surge del hecho de que su presencia y contacto con el artefacto peligroso han sido anticipados.

"¿No es razonable," se pregunta el comentarista, "concluir que el motivo por el cual un intruso, de ordinario, no puede obtener indemnización por las lesiones sufridas por él con motivo del estado de la propiedad en que ha penetrado no es que sea un transgresor cuya presencia es ilegal,—ya que la persona lesionada por la escopeta automática o por la trampa mecánica, o que inadvertidamente se desvía de la carretera, y el niño que manipula algo en la calle que no tiene derecho a manipular, son igualmente transgresores,— sino que la verdadera razón es que su presencia no ha sido anticipada, de tal modo que no existe el deber de tomar precauciones para su seguridad?"

Cita el comentarista en apoyo de sus conclusiones los casos de *Johnson* v. *Atlas Supply Co.,* 183 S. W. 31, y *McAllister* v. *Jung,* 112 Ill. App. 138. En el último de dichos casos se dice que "una razón para la regla con respecto a los intrusos puede quizás encontrarse no necesariamente en que sean transgresores, sino en el hecho de que al penetrar por su propio placer o conveniencia en la propiedad de otro que tiene derecho a hacer uso de esa propiedad creyendo que los extraños se conservarán alejados de un sitio donde no tienen derecho a estar, tales personas no solamente resultan contribuyentes al daño que puedan sufrir, sino también activos en infligirse esos daños."

Termina diciendo el comentarista que "la doctrina del peligro atrayente, lejos de ser una excepción, está de acuerdo con la regla general que determina la responsabilidad de los terratenientes a los intrusos, puesto que es esencial para que

pueda aplicarse dicha doctrina que exista alguna razón para anticipar la presencia de niños." Estamos conformes. Si el dueño de la propedad tiene motivos fundados para anticipar la presencia de niños al establecer una condición peligrosa, su deber es adoptar precauciones adecuadas y razonables para evitar daños y salvar su responsabilidad. No importa que el niño sea un intruso. No es necesario, por lo tanto, que haya sido inducido por el peligro a penetrar en la propiedad. Basta con que haya podido anticiparse razonablemente su presencia. Véase "Restatement of the Law of Torts," páginas 920, 921.

▇ En el presente caso no se trata de una transgresora. La hija de la demandante vivía en la finca de la sucesión demandada. El sitio en el cual la demandada tendió la vía es el callejón que queda frente a la casa donde vivían la demandante y su hija, a tres metros próximamente de la vía.

La muerte de la niña tuvo lugar en el momento en que los carreteros emprendían la marcha después de haber estado detenidos los vagones durante el tiempo empleado para darle comida a los bueyes. Nadie presenció el accidente, pero estuvieron presentes en el lugar del suceso el testigo de la demandante Antonio Suárez y los carreteros, testigos de la demandada, Andrés Marcucci y Cornelio Colón. Fuera de estas personas no había ninguna otra por aquellos alrededores.

La demandante, Elvira Ramos, declara que en la plaza donde transitaban los vagones, bueyes y carros, hay muchos niños, quienes iban a recoger cañas y a pegarse de los vagones, y que a veces los mismos que iban con las vagonetas les daban cañas para que ellos se retiraran.

La prueba demuestra que varios niños acostumbraban a jugar en la plazoleta al lado de la vía por donde transitaban los vagones de caña, aun cuando les estaba prohibido por la demandada. A pesar de esta prohibición los niños del vecindario solían correr detrás de los vagones para coger

pedazos de caña y montarse en ellos si los vagones estaban vacíos.

El testigo de la demandante, Antonio Suárez, declara, entre otras cosas, que luego de haber terminado su labor de darle de comer a los bueyes en unión de los carreteros dijo a éstos que podían emprender la marcha; que entonces se retiró, y estando de espaldas, vió que la joven Ana María Lugo, quien se hallaba asomada por la ventana, se puso la mano en la frente, se tapó la vista y que entonces vió la niñita revolcándose y concurrió y le metió los brazos. Dice que por el frente donde él estaba no se veía a nadie, que por los vagones no se divisa, porque como llevan cierta altura no se veía; que no vió a ningún muchacho ni a nadie por allí; que para venir acá, de los bueyes a las bolas, tenía la vista franca siempre que mirase; que no vió a la niñita; que hasta donde pudo apreciar y ver la vía, no había ningún peligro, y que por lo pronto no había motivo para suponer que hubiese algún peligro allí; que ha visto a los niños halando cañas y los ha regañado; que ha visto que ha pasado el tren de vagones vacío y se han montado atrás, y que los ha reprendido porque eso es un peligro.

El carretero Andrés Marcucci, testigo de la demandada, declara, entre otras cosas, que el encargado del ganado, Antonio Suárez, les dijo que había que darle comida a los bueyes, ahora que había tiempo; que entonces él fué y trajo la comida de los bueyes y todos la repartieron; que el testigo le dió comida a los bueyes del lado izquierdo y luego se cambió a los del lado derecho; que en ese intermedio sacaron la calesa que estaba en la vía y que entonces Antonio Suárez siguió andando para abajo y dijo: "Ya se terminó, ustedes pueden seguir viaje"; que al emprender la marcha miraron para abajo y no vieron a nadie y siguieron para arriba con los vagones; que "no vió a la chiquita porque estaba pendiente de sus bueyes y no estaba en condiciones de poderla ver; que como no veía a nadie atrás no iba a ver a nadie"; que al iniciar la marcha se montaron en el yugo de los bueyes;

que cuando fué a montar miró y no vió a nadie; que la señora del mayordomo, quien se hallaba en el balcón de una casa, dijo: "Un vagón golpeó una nena; que volaron sobre el lado de los bueyes de la derecha y corrieron a prestar auxilio donde pasó el caso; que ya el Sr. Antonio Suárez la había cogido en los brazos y se la había entregado allá para la casa.

Cornelio Colón, carretero de la demandada, declara, entre otras cosas, que como de tres a cuatro de la tarde llevaban un tren de caña con cinco vagones; que tuvieron que parar por estarse ensillando en la vía un coche del mayordomo; que le dieron alimento a los bueyes y que en ese intermedio salió el coche para afuera, diciéndole Antonio Suárez: "Pueden halar ya"; que halaron y cuando iban un poco "alante" les gritó la señora del mayordomo: "Párense, que una vagoneta ha pisado una niñita"; que cuando iban a coger la niña ya el Sr. Antonio la había recogido y la llevaba en los brazos para entregársela a los papás; que se detuvieron allí como diez minutos o una cosa así; que cuando se fué a montar miró la vía y no había nadie.

La corte inferior, en sus conclusiones de hecho, declara probado, entre otras cosas, que el sitio en que estaba la casa en que vivía la demandante era una especie de pueblito, con una plaza, alrededor de la cual existían varios establecimientos propiedad de la demandada, como tiendas, casas de mayordomos, etc., y que además al borde de un camino que desemboca en dicha plaza, existían alineadas una al lado de otra, cuatro casas iguales, una de las cuales era la que habitaba la demandante; que también había allí cuarteles de peonaje, y que en el vecindario habitan niños de distintas edades, los cuales solían jugar en el espacio comprendido entre dicho camino y la plaza; que la niña Juanita Ramos, momentos antes de ocurrir el accidente, estaba como a ocho varas de su casa en compañía de la demandante que estaba lavando ropa y que ésta la envió a su casa a tomar café, advirtiéndole que tuviera cuidado; que la niña llego a su casa y estaba detrás de la cocina instantes antes de ocurrir el suceso;

que el sitio por donde traficaban los vagones era uno peligroso para los niños y que la demandada tenía prohibido que éstos se acercasen a coger caña ni para ningún fin a los vagones que por allí transitaban, habiéndose probado, además, que la propia señora del mayordomo no permitía a su hija que bajara a la plaza de la colonia cuando comenzaba el tráfico de dichos vagones.

La demandante invoca la doctrina del peligro atrayente. Aunque técnicamente no pueda considerarse un vagón cargado de cañas como un *attractive nuisance,* la verdad es que no puede negarse que ejerce cierto poder de atracción sobre los niños. En *Davis* v. *Malvern Light & P. Co.,* 186 Iowa 884, 173 N. W. 262, se dice que la doctrina no debe extenderse hasta el extremo de incluir toda maquinaria u objeto capaz de causar daño o lesión a los niños, o que pueda en forma alguna atraerlos al sitio de peligro, ya que hacer tal cosa equivaldría a imponer a los dueños de terrenos una obligación irrazonable y a restringirles indebidamente el derecho que les asiste de usar su propiedad.

En la obra "Restatement of the Law of Torts", sección 339, pág. 925, se analiza y se compara el riesgo que corren los niños con la utilidad que pueda reportar la condición peligrosa, del modo siguiente:

"Para determinar si una condición específica mantenida por el poseedor de una finca, donde pueden acercarse niños, envuelve un riesgo irrazonable con respecto a dichos niños, es importante comparar el riesgo a que están sujetos con la utilidad al poseedor del hecho de mantener la condición peligrosa. El libre uso de una finca por su poseedor es una cuestión de interés público. Por lo tanto no se considera que una condición específica constituya un riesgo irrazonable con respecto a niños transgresores, a menos que envuelva un grave riesgo que pudiera ser evitado sin menoscabar sustancialmente el uso de la finca por su poseedor. La maquinaria agrícola y cosas similares envuelven un peligro inevitable para los niños que jueguen o que se entretengan con ellas. Sin embargo, es esencial para la agricultura permitir que se usen y se mantengan, si se conservan en un sitio y en una condición adecuada. Por otra parte, si la instalación de precauciones que eviten que la maquinaria se ponga en moción fuese fac-

tible y no resultase costoso ni menoscabase seriamente la utilidad de
la maquinaria, sería entonces irrazonable el que un agricultor man-
tuviera esa maquinaria sin adoptar las debidas precauciones en un
sitio notoriamente abierto a niños transgresores. Una plataforma
giratoria (*turntable*) puede ser esencial al funcionamiento de un fe-
rrocarril. El simple hecho de su mantenimiento en un stio donde
se sabe que los niños pueden penetrar, no arroja responsabilidad so-
bre la compañía bajo la regla estatuída en esta sección. Sin em-
bargo, si dicha plataforma puede protegerse contra los niños intrusos
mediante un artefacto que sirva para cerrarla, sería irrazonable man-
tenerla en tal lugar sin adoptar tal precaución...."

A tenor de la jurisprudencia citada, el grado de responsa-
bilidad o de cuidado que debe ejercer el demandado varía de
acuerdo con la utilidad del objeto peligroso. En este caso,
es innegable que el uso de los vagones para transportar cañas
es de utilidad para la demandada y para la industria a que
se dedica. También hay que reconocer que la industria de
caña es de utilidad a la comunidad. No es necesario, por lo
tanto, esperar de la demandada precauciones extraordinarias,
en la hipótesis de que se trate de un *attractive nuisance,* por-
que esto equivaldría a imponerle una carga excesiva sobre
una industria que es socialmente útil; pero creemos firme-
mente que dicha demandada estaba obligada a adoptar pre-
cauciones ordinarias, actuando con el debido cuidado para
evitar el accidente. Aunque el objeto peligroso resulte de
utilidad, de acuerdo con la jurisprudencia citada, el dueño
o poseedor de dicho objeto tiene la obligación de adoptar
aquellas medidas que resulten pertinentes para evitar el daño
siempre que resulten razonables, que no sean onerosas, y que
no destruyan la utilidad del objeto.

No hay duda de que los vagones, vacíos o cargados de
cañas, ya estén detenidos o en moción, constituyen una atrac-
ción para los niños. La demandada debió anticipar la pre-
sencia de niños en el sitio de peligro y ejercer el debido cui-
dado para evitar accidentes al ponerse los vagones en moción.
En nuestro sentir, la responsabilidad de dicha demandada es
manifiesta, tanto si nos atenemos a la teoría del *attractive*

*nuisance,* como si nos basamos en aquellos principios generales que se aplican en casos ordinarios de negligencia. La prueba demuestra que los carreteros que conducían los vagones se encontraban entretenidos dándole comida a los bueyes. Aunque se ha demostrado que en aquel momento no había niños cerca de la vía, la verdad es que en otras ocasiones acostumbraban aproximarse al peligro y que, como ya hemos dicho, la demandada debió haber anticipado la presencia de niños allí. *Denver City Tramway Co.* v. *Nicholas,* 84 P. 813. Los carreteros debieron estar alertas para evitar que alguno de los niños de los vecinos que residían en las casas próximas a la vía se acercasen al sitio de peligro. Si hubieran ejercido alguna vigilancia es de presumirse que hubiesen visto a la niña y evitado el accidente, ocurrido al ponerse los vagones en moción. Esta vigilancia no le ocasionaba gasto alguno a la demandada ni le imponía precauciones irrazonables. *Louisville & N. R. Co.* v. *Steele,* 201 S. W. 43, 44, *et seq.*

La única precaución que adoptaron los carreteros fué mirar en el momento en que se iniciaba la marcha de los vagones y se montaban en los yugos de los bueyes. Estando como estaban entretenidos en dar alimento a los bueyes, sin ejercer vigilancia alguna para observar a algún niño que pudiera acercarse a la vía, no creemos que hayan adoptado las precauciones razonables que debieron ejercer, y que hubieran, indudablemente, de haber sido ejercitadas, evitado el accidente.

Todo induce a creer que la niña se coló entre dos vagones y fué atrapada por los mismos al emprender la marcha. Los carreteros no ejercieron el debido cuidado, porque de haber mirado detenidamente y de haberse fijado habrían visto a la niña y se hubiera evitado el accidente.

Opinamos que si hubo razón para anticipar la presencia de niños, como ocurrió en el presente caso, no tiene importancia la forma y manera en que la hijita de la demandante se acercó a los vagones.

*Debe revocarse la sentencia apelada y dictarse otra en su lugar condenando a la demandada a satisfacer a la demandante la suma de $2,500, con las costas, excluyendo honorarios de abogado, por entender que, dada la naturaleza de las cuestiones planteadas, no puede decirse que la referida demandada haya incurrido en temeridad.*

El Juez Asociado Señor Wolf no intervino.

EN MOCION DE RECONSIDERACION *
Junio 15, 1937

APELACIÓN—VISTA Y NUEVA VISTA O RECONSIDERACIÓN—RECONSIDERACIÓN DE SENTENCIA—FUNDAMENTOS O CAUSA DE RECONSIDERACIÓN—CUESTIONES NO OBJETO DE APELACIÓN.—Una parte carece de autoridad para solicitar la reconsideración de una sentencia basada en una cuestión que no ha sido objeto de apelación.

La parte demandada solicita la reconsideración de nuestra sentencia, alegando que incurrimos en error al pasar por alto y no dar peso a la siguiente defensa especial alegada en la contestación a la demanda:

"La demandante Elvira Ramos con fecha 19 de junio de 1933, mediante suficiente consideración, relevó y eximió a la demandada de cualquiera y todas las acciones, reclamaciones y demandas a que tuviera derecho ella como madre investida con patria potestad sobre su hija menor, Juanita Ramos, por el accidente ocurrídole el día 9 de junio de 1933 y a virtud de la muerte de dicha menor, reconociendo bajo juramento que el accidente ocurrido se debió a una simple desgracia y eximiendo expresamente de culpa a la demandada."

La actitud de la demandada constituye para nosotros una sorpresa. Esta cuestión jamás ha sido suscitada ante este tribunal. Es verdad que la demandante se anticipó a rebatir la defensa establecida por la parte demandada, haciendo constar cuando declaraba ante la corte sentenciadora que aceptó un cheque por la cantidad de $50 en la creencia de que recibía dicha cantidad de parte de la sucesión demandada en pago de los gastos incurridos por ella con motivo del

NOTA: A solicitud del abogado de récord Fernando B. Fornaris, el Tribunal ordenó se haga constar que dicho abogado rehusó representar a la demandada en la moción de reconsideración.

accidente. La demandada ofreció como prueba el documento suscrito por la demandante Elvira Ramos acusando recibo de la cantidad de $50 y relevando de toda responsabilidad, relacionada con el accidente ocurrido a su hija, a la Sucesión J. Serrallés y a Maryland Casualty Company.

La corte sentenciadora desestimó la demanda, luego de oída la prueba, sin hacer pronunciamiento alguno con respecto a la defensa establecida por la parte demandada. No solicitó ésta de la corte inferior que resolviese la cuestión planteada ni estableció recurso alguno sobre este particular. En su extenso y laborioso alegato presentado ante este tribunal, la referida demandada nada dice acerca de esta defensa. Es después de revocada la sentencia de la corte inferior que la demandada invoca una defensa que nunca fué planteada ni en los alegatos ni en la audiencia pública celebrada ante este tribunal. Y es precisamente la parte que ha observado esta conducta la que nos apremia para resolver una cuestión tácitamente abandonada.

A nuestro juicio, la parte demandada, que no llamó la atención de la corte inferior acerca de su omisión ni estableció recurso alguno para ante este tribunal, carece de autoridad para solicitar la reconsideración de la sentencia basada en una cuestión que no ha sido objeto de apelación.

En cuanto a los demás particulares tratados por la parte apelada, nos atenemos a las conclusiones establecidas en la opinión y sentencia de este tribunal.

*No ha lugar a la reconsideración solicitada.*