JUANA SUÁREZ VIUDA DE ARROYO, demandante y apelante, *v.* MANUEL SAAVEDRA SOLER, demandado y apelado.

Núm. 8465.—*Sometido:* Abril 29, 1942. *Resuelto:* Junio 19, 1942.

*José Veray, Jr.,* abogado de la apelante; *García Méndez & García Méndez,* abogados del apclado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Por segunda vez viene este pleito a esta Corte Suprema. Se inició en 1933 en la de distrito de Aguadilla, que lo falló en contra de la demandante, a virtud de una moción de *nonsuit* que presentara el demandado. La demandante apeló y la sentencia fué revocada en febrero 14, 1938, *Suárez v. Saavedra,* 52 D.P.R. 684, devolviéndose los autos para ulteriores procedimientos no inconsistentes con la opinión.

En la corte de distrito las partes se pusieron finalmente de acuerdo en que debía permitirse al demandado que practicara su prueba. Practicada, la corte volvió a dictar sentencia en contra de la demandante y ésta apeló. Su recurso es el que está ahora sometido a nuestra consideración y resolución.

■ Se trata de una acción por daños y perjuicios iniciada en 1933 por la madre de un menor contra un patrono, por la muerte del menor ocasionada por un empleado del patrono a virtud de un acto violento realizado dentro del radio de su empleo.

Para probar su caso presentó la demandante los testimonios de Salvador Nenadich, Carlos Martínez y Gilberto del Valle.

Nenadich, un muchacho de trece años, dijo que conoció a Juan Arroyo Suárez, quien el 17 de febrero de 1932 caminaba por la orilla de la Cuesta Nueva de la carretera de Isabela a Aguadilla, cuando Félix González, que iba en un *truck* cargado de cañas de Manuel Saavedra, le tiró con una caña "con todita su fuerza y con coraje" y le dió. Había otras personas cogiendo cañas. González no tiró al grupo sino a Juan.

Martínez conoció al hijo de la demandante, Juan, a quien Félix González, conductor del truck de cañas del demandado, en febrero 17, 1932, golpeó con una caña. Juan "venía corriendo con un grupo de muchachos." Félix "se trepó arriba de las cañas y con una de ellas le tiró con fuerza y con coraje" al grupo, dando a Juan. El "niñito [Juan] no estaba cogiendo cañas . . . estaba agrupado con los que cogían cañas." Murió a consecuencia del golpe.

Gilberto del Valle, de diecisiete años de edad, vió a Juan herido en la Cuesta Nueva. Decía que González, guardián de las cañas del truck, le había tirado con una caña. El truck no se detuvo. El muchachito se quejaba, no podía andar.

Luego se llamó a la propia demandante, quien manifestó que era viuda, que Juan era su hijo, que tenía catorce años y estaba en la escuela, en quinto grado; que el 17 de febrero de 1932, cuando el golpe, lo llevaron al Hospital Municipal, donde lo asistieron los doctores Cardona e Igartúa, que allí pasó tres días atendido por médicos y *nurses,* y murió. No ha pagado honorarios. No le han pasado la cuenta.

Según el acta de defunción, introducida en evidencia, el niño falleció el 21 de febrero de 1932, a consecuencia de perforación traumática del íleon.

Presentada por el demandado una moción de *nonsuit,* fué resuelta en su favor, dictando la corte de distrito sentencia declarando la demanda sin lugar. Apeló la demandante y esta corte, como se ha indicado, revocó la sentencia, declaró sin lugar la moción de nonsuit y devolvió el caso a la corte de su origen para ulteriores procedimientos no inconsistentes con la opinión.

En esa opinión, emitida por el Juez Asociado Sr. Hutchison, se estudió el caso y se expuso la ley, la jurisprudencia y los principios de derecho aplicables, diciéndose al final,

"En las cortes insulares no existe el juicio por jurado en casos civiles. Un juez de distrito, al resolver una moción de *nonsuit,* no está impedido de hacer las inferencias que de la prueba sean razonables y propias. *Rosado* v. *Ponce Ry. & Light Co.,* supra. Sin embargo, al hacer tales inferencias debe tener presente que, según se indicó en el caso de Rosado, 'las mociones de sobreseimiento deben ser consideradas con cautela y concederse únicamente en aquellos casos que son completamente claros.' Desde luego, tampoco debe estar en un error en lo que respecta a la ley aplicable a los hechos que tiene ante sí. Si en el presente caso fuera claro que no existiera ningún error de hecho o de derecho y que el resultado hubiese sido el mismo de haberse declarado sin lugar la moción de nonsuit, no habría motivo alguno para la revocación de la sentencia.

"La teoría de la moción del demandado fué que el principal es sólo responsable de los actos negligentes o descuidados de su agente, pero nunca de un acto criminal de tal agente. Esa no es la ley.

"El juez de distrito no adoptó definitivamente la teoría de la ley sustentada por el demandado. Su razonamiento estaba principalmente en armonía con la verdadera doctrina (*test*). No obstante, su conclusión y el resultado pudieron haber sido distintos a no ser por la influencia que sobre él ejerció la teoría del demandado. El declarar sin lugar la moción de nonsuit, desde luego, no excluye que la corte de distrito considere luego la prueba a la luz del curso indicado por los casos más recientes, conforme demuestran los extractos anteriores." *Suárez* v. *Saavedra*, 52 D.P.R. 684, 690–691.

La evidencia aportada últimamente por el demandado consistió en su propia declaración y en la de Félix González.

Saavedra dijo en resumen que González fué empleado como chófer auxiliar para dar aviso desde detrás; que jamás le dió instrucciones de que castigara a los muchachos que se acercaran al truck a coger cañas; que González no tenía tal autoridad. A repreguntas sobre quién era el que custodiaba la caña que llevaba el truck, contestó que nadie, que no había que custodiarla.

González dijo que sus atribuciones eran "cargar la caña en el truck y avisarle al *chauffeur* cuando venía un carro." "Él," Saavedra, "me dijo que yo estaba allí para cargar esa caña y velar por sus intereses."

Dicho eso, seguidamente le preguntó el abogado del demandado y él contestó como sigue: "P. Por la caña ésa, ¿cómo velaba usted?—R. Velarlas que no se cayeran o se perdieran.—P. Y si algún muchacho le halaba alguna caña, ¿recibió usted alguna instrucción de don Manuel Saavedra de que le tirara con la caña?—R. No, señor; él me dijo que si los muchachos halaban las cañas que las halaran y que no les hiciera caso."

Admite que el día del suceso "se pegaron" al truck "todos los [muchachos] que salían de la escuela" a halar cañas, pero niega que tirara con una caña al grupo o a muchacho alguno en particular.

Apreciando la totalidad de la prueba, volvió la corte de distrito a dictar sentencia declarando la demanda sin lugar.

Su apreciación se resume en los dos siguientes párrafos de su relación del caso y opinión, a saber:

"Considerando la prueba toda, tiene la corte que concluir que González lanzó el trozo de caña contra el niño Arroyo directamente y de manera tal que constituye su acción una conducta tan desaforada que exonera al patrono de toda responsabilidad.

"Además, la evidencia del demandado demuestra que González no estaba autorizado para atacar o castigar a los niños por coger las cañas y que su única misión era tocar el pito para avisar al *chauffeur* cuando había de darse paso a otro vehículo o cuando se desarreglase o desnivelase la caña. Al actuar fuera de las instrucciones de su principal y de la manera tan desaforada e infligiendo el severo castigo que demuestra la prueba de la demandante, el empleado se desvío enteramente de las atribuciones de su empleo, no siendo por tanto responsable el demandado Saavedra."

No estamos conformes con la corte sentenciadora. A pesar de la natural tendencia de las declaraciones del demandado y su empleado de evadir la responsabilidad que se exige al primero por los actos del segundo, lo cierto es que bien analizadas prueban lo contrario de lo que intentaron demostrar.

La declaración de Saavedra es larga. Hace todo lo posible por eludir la admisión del hecho de que González era su empleado, pero la verdad se impone y lo admite. Puede aceptarse que no dió a dicho empleado instrucciones específicas de castigar a los muchachos que cogieran cañas, pero su manifestación de que nadie debía custodiar la caña, es increíble.

Su propio empleado lo contradice. Contestando una pregunta de su abogado dijo que recibió instrucciones de Saavedra no sólo de cargar la caña si que de "velar por sus intereses." Se le sigue preguntando en la forma que conocemos, y limita el cuidado de la caña a un fin determinado. Lo que dice sobre los muchachos es ciertamente inverosímil.

Creemos que la evidencia aportada es suficiente para concluir que González fué empleado por el demandado en el tra-

bajo de transportar caña en un truck guiado por otra persona, siendo sus obligaciones cargar la caña, situarse en la parte trasera del truck para avisar al chófer, cuando el truck estaba en movimiento, en relación con el tránsito, y cuidar en general de la propiedad transportada, y que siendo ello así, estaba dentro del radio de su empleo el evitar que ninguna persona, incluyendo muchachos, se llevara las cañas sin autoridad.

Por lo tanto, cuando el 17 de febrero de 1932 el grupo de muchachos se acercó al truck para coger cañas sin derecho alguno, el acto realizado por el empleado tirando el pedazo de caña al grupo para que la toma cesara, se realizó en defensa de los intereses del patrono y dentro del radio de su empleo.

Es cierto que el empleado actuó con demasiada violencia, pero esa violencia, atendidas todas las circunstancias concurrentes—sitio, clase de transporte, número de niños, naturaleza del objeto que se lanzó e intención con que fué lanzado —no permiten que el caso caiga dentro de la cita que se hace a la página 687 de la opinión de esta corte en *Suárez* v. *Saavedra,* 52 D.P.R. 684, como sigue:

" ' El hecho de que el empleado actúe de manera desaforada o inflija castigo desproporcionado a las necesidades del negocio de su patrono, es evidencia que indica que el empleado se ha desviado de las atribuciones de su empleo al realizar el acto.' '' (Pág. 550.)

Dichas circunstancias lo colocan dentro de otra cita que aparece también en la indicada opinión, igualmente tomada del 1 *Restatement of the Law of Agency,* 550, 551, a saber:

" '*A* es empleado por *P* como conductor de un camión de repartir hielo. Mientras *A* reparte el producto unos cuantos chicuelos le molestan tratando de obtener pedacitos de hielo. *A* lanza un trozo de hielo contra uno de ellos a fin de poder adelantar en su trabajo. El hecho de que el empleado trate de causar daño al niño y vengarse de ese modo de las molestias recibidas, no impide que el acto caiga dentro de las atribuciones de su empleo.' '' (Pág. 551.)

Siendo aplicable la jurisprudencia establecida en los casos de *Doscher* v. *Superior Fire Proof Door & Sash Co., Inc.* (N. Y.), 221 App. Div. 63, y *Zerngis* v. *H. P. Hood & Sons Co.*, 152 N. E. 50, de Massachusetts, citados en la repetida opinión de *Suárez* v. *Saavedra,* supra, a la página 688.

Resta sólo fijar la cuantía de la indemnización. En la demanda se pide la suma de quince mil dólares, que es claramente excesiva. Reclama una madre, que es viuda, por la muerte de un hijo de once a catorce años de edad, que estaba en la escuela cursando el quinto grado. No se probó que el hijo tuviera habilidad especial alguna. La evidencia fué muy deficiente sobre el particular.

En el caso de *Maldonado* v. *The Porto Rico Drug Co.*, 31 D.P.R. 747, 766–767, en que un padre reclamó por la muerte de un hijo de ocho años a consecuencia de haber ingerido ciertas cápsulas de chenopodio que indebidamente le vendiera la demandada y en que hubo de revocarse la sentencia apelada y dictarse la que debió haber dictado la corte de distrito, esta corte se expresó así:

"¿Probó la parte demandante los daños y perjuicios reclamados? No existe en toda la evidencia dato alguno que demuestre a cuánto ascendieron los gastos del padre con motivo de la enfermedad y muerte de su hijo. Ningún daño concreto·fué probado. Sólo hay una base: la muerte misma del niño, que ha sido reconocida por la jurisprudencia como suficiente para la concesión de daños y perjuicios en casos de esta naturaleza.

"La ley en Puerto Rico sobre la materia es igual a la que rige en California y la Corte Suprema de dicho Estado ha resuelto que: 'El elemento principal de los daños es el valor que probablemente hubieran tenido los servicios del niño muerto hasta llegar a su mayor edad; el jurado está limitado al daño pecuniario efectivo causado al padre. La pérdida de servicios no constituye un daño especial que sea necesario alegar. Un veredicto por $20,000 fué anulado por ser excesivo: *Morgan* v. *Southern Pac. Co.*, 95 Cal. 510; 29 Am. St. Rep. 143. Véase también el caso de *Cleary* v. *City R. R. Co.*, 76 Cal. 240, en cuanto a la indemnización a que un padre tiene derecho por

la muerte de su hijo menor causada por la negligencia de otro.' Pomeroy's *Cal. Code of Civil Procedure,* pág. 123.

"En el último de los casos citados, la corte dice:

" 'Bajo el artículo 377 del Código de Enjuiciamiento Civil, el montante de la indemnización a que un padre tiene derecho por la muerte de su hijo menor causada por la negligencia de otro, es aquella suma que, considerando todas las circunstancias del caso, es justa y razonable; y al determinar el importe de la indemnización el jurado puede correctamente tener en cuenta no sólo la pérdida de los servicios del niño durante su menor edad y los gastos de asistencia médica y de entierro, sino también la angustia y sufrimiento moral de los padres.' *Cleary* v. *City R. R. Co.,* 76 Cal. 240.

"Dadas las circunstancias concurrentes en este caso, la angustia, el sufrimiento moral de los padres tuvo que ser necesariamente intenso. En cuanto a los servicios probables del hijo, sólo conocemos que tenía ocho años faltándole trece para llegar a la mayor edad. En Puerto Rico, sobre todo entre las familias enteramente pobres o de pocos bienes de fortuna, no es raro el caso en que un menor de edad trabaja y aporta por completo el producto de su trabajo a gastos generales del hogar. Mucho depende de la condición de salud, de la personalidad del menor. Nada concreto conocemos aquí, pero algún valor será siempre necesario dar a los servicios del hijo.

"Atendido, pues, el resultado de la prueba, nos parece que la cuantía de la indemnización puede razonablemente fijarse en tres mil dólares."

Luego, en *Ramos* v. *Sucn. Serrallés,* 51 D.P.R. 343, en que se tratabá de la muerte de una niña de tres años que fué arrollada por un vagón de la demandada, al revocar también la sentencia apelada y dictar la que debió haber dictado la corte de distrito, se fijó la indemnización en dos mil quinientos dólares.

Y por último, en *Castro* v. *González,* 58 D.P.R. 368, 383, en que el padre reclamó por la muerte de una hija menor y la corte de distrito fijó la indemnización en doce mil dólares, esta corte, al rebajarla a cinco mil, se expresó así:

" . . . Sabemos que ninguna cantidad, por fuerte que sea, es suficiente para compensar a cabalidad por la muerte de un hijo;

pero habida cuenta de la práctica seguida en esta jurisdicción y de las circunstancias de este caso, opinamos que una sentencia por $12,000 sobrepasa los límites establecidos. . . .''

Atendidas todas las circunstancias concurrentes, nos parece que tres mil dólares constituye una indemnización apropiada.

*En virtud de todo lo expuesto, debe revocarse la sentencia apelada y dictarse otra condenando al demandado a pagar a la demandante la indicada suma, con las costas, incluyendo trescientos dólares como honorarios de abogado.*